NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

BANGOR BUILDING TRADES COUN-
CIL, AFL–CIO, et al., Respondents.

No. 5531.

United States Court of Appeals
First Circuit.

April 18, 1960.

Fred S. Landess, Attorney, Washington, D. C., with whom Stuart Rothman, General Counsel, Thomas J. McDermott, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Melvin Pollack, Attorney, Washington, D. C., were on brief, for petitioner.

Henry Wise, Boston, Mass., with whom Robert L. Wise and Wise & Wise, Boston, Mass., were on brief, for respondents.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

ALDRICH, Circuit Judge.

This is a petition for enforcement of an order of the National Labor Relations Board issued in conjunction with the Board's decision which found that the respondents, Bangor Building Trades Council, AFL–CIO; Hoisting and Portable Engineers Local 4, International Union of Operating Engineers, AFL–CIO; and Local 1377, International Hod Carriers', Building and Common Laborers' Union of America, AFL–CIO (hereinafter referred to as Council, Local 4 and Local 1377 respectively), violated section 8(b) (4) (A) of the National Labor Relations Act, 61 Stat. 141 (1947), 29 U.S.C.A. § 158 (b) (4) (A). The charging parties were Davison Construction Company, Inc., and Joseph R. Cianchette, general contractor and subcontractor respectively on a building project. The Board first sought a court injunction, under section 10(l) of the Act, 29 U.S.C.A. § 160(l), which issued on August 20, 1958, after a hearing. A hearing was then held before the trial examiner at which no testimony was taken, the parties having stipulated "that the record made in the District Court case * * * be the record herein." The parties also waived any further proceedings before the trial examiner, and agreed that the matter might be transferred forthwith to the Board and "that the Board shall decide the issues herein on the basis of the record as made herein on this date, that is, the pleadings in the instant cases, * * * and the record made before the District Court, the latter of which is stipulated and incorporated herein."

On the basis of this record the Board made its findings of facts, which may be summarized as follows. Davison was the general contractor for a housing project. Cianchette had a subcontract for excavating, grading, and constructing facilities for utilities at this project. Respondent Local 4 had a collective bargaining agreement with Davison which contained provisions respecting wages, hours and other terms and conditions of employment governing Davison's employees (including a union-shop clause) and also provided: "26. It is understood that this Agreement binds all the subcontractors as well as the general contractor." Cianchette's employees were not represented by any union, nor did he have a collective bargaining contract with any labor organization. On July 8, 1958, Davison's general superintendent on the project, Peterson, was contacted by one Ryan, business agent of Local 4. The Board states that according to Peterson, Ryan asked him what he intended to do about Cianchette's working on the project, but that according to Ryan he merely said he was "shocked" that "union conditions" were not being observed. Although not expressly resolving this conflict, the Board noted that Ryan "admitted" he had no knowledge at the time whether in fact—apart from being non-

union—Cianchette was observing union conditions or not (and we note, further, that Ryan admitted that he made no attempt to find out). Subsequently, Peterson on three occasions met with various representatives of the trade unions affiliated with the Council. Again, the Board reports the conflicting testimony without expressly resolving the conflict. It states that Peterson testified that respondents wanted to get Cianchette off the job, but that respondents' witnesses denied this and testified that respondents were interested only in having Davison comply with Article 26 of its contract. The Board then found as a fact that thereafter the steward of Local 1377 told an employee of Davison that there was to be a strike, and said, "It is against Cianchette for not being union." Later the Council's Executive Board formally authorized the picketing of the project. The pickets carried signs which read:

"Davidson [sic] Co.
Unfair
Permitting Working Conditions
on this job not in accordance
With Standards of Bangor
Building Trades Council

J. R. Cianchette Co.
does not abide by minimum
Standards of Conditions
of employment."

Upon appearance of these pickets all employees of Davison and of the subcontractors other than Cianchette, quit work or refused to cross the picket lines.

Section 8(b) (4) (A) makes it an unfair labor practice for a union "to engage in, or to induce or encourage the employees of any employer to engage in, a strike * * * where an object [1] thereof is * * * forcing or requiring * * any employer or other person * * * to cease doing business with any other person * * * ." The Board, in its concluding findings, stated, "While there are certain conflicts in testimony, we are convinced that the record as a whole establishes that the Respondents engaged in this proscribed conduct. Inducement is clear. * * * It is equally clear that at least *an* object of the Respondents' conduct was to force Davison to terminate its subcontract with Cianchette— i. e., cease doing business with Cianchette." (Ital. Board's.)

Because it is not certain how far this last sentence extended as a finding of fact, particularly as the Board proceeded to discuss certain legal inferences and principles, and nowhere specifically stated what underlying testimony it believed, we will consider this statement in its aspect most favorable to respondents, namely, that respondents were endeavoring to enforce Article 26 of Local 4's contract.[2] That article, as already stated, provided that "this Agreement binds all the subcontractors as well as the general contractor." Respondents not only contended that their primary dispute was with Davison; they took the extreme position that they had no dispute at all with Cianchette, and that they were merely endeavoring to get Davison, pursuant to its undertaking, "to see to it that Cianchette did at least the minimum which was to recognize union standards." A more exact analysis of Article 26 and of respondents' purpose is necessary.

---

1. A word such as "direct" or "immediate" should perhaps be inserted before the word "object" in view of the protection afforded to primary disputes under section 13 of the Act, 29 U.S.C.A. § 213. See N.L.R.B. v. Denver Building and Construction Trades Council, 1951, 341 U.S. 675, 685–687, 71 S.Ct. 943, 95 L.Ed. 1284; N.L.R.B. v. International Rice Milling Co., 1951, 341 U.S. 665, 672–673, 71 S.Ct. 961, 95 L.Ed. 1277.

2. There was credible evidence, having in mind that all the respondents were prime movers in the strike although only Local 4 was shown to have a contract, that the strike was a simple secondary boycott directed against Cianchette. But because the Board's opinion is regrettably unclear on this matter, we resist this easy solution of the case.

At one point in the pre-strike discussions respondents allegedly claimed that all that Article 26 required was that if Cianchette did not "recognize union standards" Davison would make up the cash difference. They did not specify whom Davison was to pay, but we assume that Cianchette's employees were meant, although, of course, Davison had no contractual relations with them. However, respondents do not, and in our opinion could not (but cf. N. L. R. B. v. Local 47, International Brotherhood of Teamsters, etc., 5 Cir., 1956, 234 F.2d 296, 300), adhere to that position. Article 26 is plainly broader than the payment of wages. It contains no exceptions, but embraces all the provisions of the Davison contract. Hence it includes union recognition. Respondents were not unaware of this. In their brief they frankly say, "[C]ontract observance * * * *does not necessarily mean displacement of Cianchette;* it can and does mean only that Cianchette would have to abide by the contract. But that, of course, is truly damnation in the mind's eye of Cianchette in that his employees * * * would have to join up with Local 4 * * *." (Ital. ours.) This squarely states the issue. Under the contract Cianchette must be compelled to unionize, or he must be "displaced."

 If one alternative purpose of a strike is an unlawful one within the purview of section 8(b) (4), that purpose must be regarded as "an object." [3] N. L. R. B. v. Denver Building etc. Council, supra, note 1. See also Local 47, International Brotherhood of Teamsters, etc. (Texas Industries, Inc.), 1955, 112 N.L.R.B. 923, enforced, N. L. R. B. v. Local 47, etc., 5 Cir., 1956, 234 F.2d 296. Moreover, an attempt to force one employer to sever business relations with another person is not protected by virtue of reliance upon a contract with the employer. "The realities of coercion are not altered simply because it is said that the employer is forced to carry out a prior engagement rather than forced now to cease doing business with another. * * * [T]he contract cannot be enforced by the means specifically prohibited in § 8(b) (4) (A)." Local 1976, United Brotherhood of Carpenters, etc. v. N. L. R. B., 1958, 357 U.S. 93, 106, 108, 78 S.Ct. 1011, 1019, 2 L.Ed.2d 1186 (Sand Door case). The justification of a primary dispute in the case at bar cannot be sustained.[4]

3. In the case at bar it is peculiarly inappropriate for respondents to contend otherwise, as it appears likely that an attempt to cause Cianchette to recognize the union by bringing pressure on him through Davison would constitute a violation of section 8(b) (1) (A) and (2). See Northern California Chapter, The Associated General Contractors of America, Inc., 1957, 119 N.L.R.B. 1026, 1032–33, enforced sub nom. Operating Engineers Local Union No. 3 etc. v. N.L.R.B., 1959, 105 U.S.App.D.C. 307, 266 F.2d 905, cert. den. sub nom. St. Maurice, Helmkamp & Musser v. N.L.R.B., 361 U.S. 834, 80 S.Ct. 86, 4 L.Ed.2d 76.

4. It has been suggested that Denver Building and other construction cases are an exception to the general rule that section 8(b) (4), which deals merely with specific activities and proscribed objects, is not to be interpreted to forbid what are really primary activities. See Note, 34 N.Y.U.L.Rev. 1299 (1959). But even

if that be so, Denver is still the law. The recent amendments to the National Labor Relations Act, while outlawing "hot cargo" agreements in general, make an exception for subcontracting clauses in the construction industry. Section 8(e), added by section 704(b) of the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 543, 29 U.S.C.A. § 158(e). However, the exception pertains only to their validity. No changes were made in section 8(b) (4) to permit unions to enforce such clauses by the means therein proscribed, and the law remains that unions must hope for voluntary compliance on the part of the contracting employer. The conference report makes it quite explicit that the provision "is not intended to limit, change, or modify the present state of the law with respect to picketing at the site of a construction project", and that such cases as Sand Door and Denver Building remain in full effect. H.R.Rep. No. 1147, 86th

We turn to the question of the order. The Board's order in this case requires respondents, among other things, to cease and desist from violating section 8(b) (4) (A), not only when directed against Cianchette, but also as to all other employers. The theory behind such an order is that if only the particular violation is enjoined respondents will merely shift their field of operations. As justifying that apprehension here the Board points to a remark made by Business Agent Ryan to Peterson, Davison's job superintendent. Peterson had asked why respondents were pressuring only Davison when other general contractors were also using "non-union" subcontractors. Ryan's answer was that they "had to start somewhere." This, in our opinion, falls far short of showing "a proclivity for unlawful conduct," the customary test for a broad order. McComb v. Jacksonville Paper Co., 1949, 336 U.S. 187, 192, 69 S.Ct., 497, 500 93 L.Ed. 599. It does not seem to us that simply because respondents had to start somewhere it is to be assumed that they will continue, once it has been ruled that their conduct was improper. Particularly having in mind the immediate injunctive remedy available to the Board in case of a new violation, the extent of the possible harm should be weighed against the likelihood of any reoccurrence, with the burden on the Board to justify the breadth of its order. While in N. L. R. B. v. Springfield Building and Construction Trades Council, 1 Cir., 1958, 262 F.2d 494, we imposed an order of this character, in that instance there had been two violations, in implementation of an announced policy at least tacitly sanctioned at a union meeting, whereas here we have only a perhaps rather offhand remark by one union official. We do not think the present case sufficiently serious. N. L. R. B. v. United Brotherhood of Carpenters and Joiners of America, AFL–CIO, 7 Cir., 276 F.2d 694. See also 72 Harv.L.Rev. 1577–81 (1959). The

order must be confined to activities directed against Cianchette.

Decree will enter enforcing the order of the Board, except to the extent inconsistent with this opinion.

Cong., 1st Sess. 39 (1959), U.S.Code Cong. & Adm.News 1959, p. 2511. For a general discussion see Aaron, The Labor Management Reporting and Disclosure Act of 1959, 73 Harv.L.Rev. 1086, 1112–21 (1960).