John F. LEBUS, Regional Director of the Fifteenth Region of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

INTERNATIONAL UNION OF OPERATING ENGINEERS, HOISTING AND PORTABLE, LOCAL UNION 406, Respondent.

Civ. A. No. 10457.

United States District Court
E. D. Louisiana,
New Orleans Division.

Oct. 25, 1960.

Jerome L. Avedon, Washington, D. C., for petitioner.

Dodd, Hirsch, Barker & Meunier, Thomas J. Meunier, New Orleans, La., for respondent.

Cobb & Wright, Joseph V. Ferguson, II, New Orleans, La., Steptoe & Johnson, N. Thompson Powers, Washington, D. C., for Baltimore Contractors, Inc.

**J. SKELLY WRIGHT, District Judge.**

█ Under Section 10(*l*) of the Taft Hartley Act, 29 U.S.C.A. § 160(*l*), the Regional Director of the NLRB is seeking a temporary injunction against the respondent Union to restrain it from picketing a tunnel construction site at Houma, Louisiana, or striking against Baltimore Contractors, Inc., the general contractor for the job, pending its investigation of an unfair labor charge lodged against the Union. Under this procedure, it is not the court's function to examine the merits of the complaint, but simply to determine whether there is sufficient substance in the charge to warrant temporary injunctive relief to preserve the status quo. See National Labor Relations Board v. Denver Bldg. Council, 341 U.S. 675, 681–683, 71 S.Ct. 943, 95 L.Ed. 1284.

The dispute arises out of a subcontract for part of this work awarded by Baltimore to J. P. Talley & Company, who uses non-union labor. The Engineers are attempting to force Baltimore to oust Talley from the project unless it signs with the Union. Talley has refused to recognize the Engineers and Baltimore has not withdrawn the subcontract. Hence, the picketing of the construction site and the resulting work stoppage.

The Union's position is that its action is merely directed to compelling Balti-

more to abide by its agreement to subcontract work only to firms hiring union labor. The NLRB maintains that even if Baltimore agreed to any such undertaking,[1] the "subcontractor clause," as it is commonly termed, cannot be enforced in this way, and that the Union's conduct violates the "secondary boycott" provisions of the Taft Hartley Act, Section 8(b)(4)(A) and (B), as amended by the Labor Reform Act of 1959. 29 U.S.C.A. § 158(b)(4)(A) and (B) (Pocket Parts). The Engineers reply that their only quarrel is with Baltimore, which has breached its contract, not Talley, toward whom it stands indifferent, and that, accordingly, their action cannot properly be labeled a *secondary* boycott.

If the question were to be resolved under a general statute which vaguely prohibited "secondary" activity, this would be a close case. For, while the Union perhaps exaggerates its indifference to organizing Talley, nevertheless, there is strong reason to conclude that its primary dispute is with Baltimore for refusing to abide by the so-called "subcontractor" clause, and that the main purpose of the Union's activities is not to penalize Talley, but to compel Baltimore to live up to its agreement.

 Under the circumstances, it would be difficult to label Baltimore a mere "neutral" or "secondary" employer being "used" by the Union to bring indirect pressure on Talley, as the "primary" object of the dispute. But the Taft Hartley Act is not vague, and, right or wrong, it broadly prohibits a strike or other coercive measure "where * * an object thereof is * * * forcing or requiring any person * * * to cease doing business with any other person * * *." 29 U.S.C.A. § 158(b)(4). There is no room for speculation: the policy of the Act is to declare such action unlawful, regardless of the cause or the motive. Having admitted that its activity is designed to compel Baltimore to terminate its contract with Talley, a proscribed object, the Union can never justify it. National Labor Relations Board v. Denver Bldg. Council, supra. Even the fact that Baltimore has expressly undertaken not to subcontract work to non-union firms and that the action taken by the Engineers is designed to enforce that valid agreement does not excuse their conduct. This is precisely the teaching of the so-called Sand Door case. Local 1976, United Brotherhood of Carpenters and Joiners of America, A. F. L. v. National Labor Relations Board, 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186.

 Respondent argues, however, that, if such *was* the law, the recent amendments to the Taft Hartley Act incorporated in the 1959 Labor Reform Law have changed it. But, on the contrary, every indication is that, so far as the construction industry is concerned, no change whatever was intended. It is true that, while banning for the first time all other "hot cargo" clauses, a new section 8(e), 29 U.S.C.A. § 158(e) (Pocket Parts),[2] expressly legalizes "subcontrac-

---

1. Baltimore Contractors denies that it is bound by the "Memorandum" which contains the "subcontractor clause." But the NLRB assumes the provision is effective and this court will indulge the same assumption.

2. Section 8(e) provides:
"It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business

with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: *Provided*, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work: *Provided further*, That for the purposes of this subsection and subsection (b)(4)(B) of this section the terms 'any employer', 'any person engaged in commerce or an industry affecting com-

tor" provisions in the construction industry. But the continued validity of such clauses does not alter their unenforceability through strikes and other coercive measures. The legislative history of the amendment is clear on this point. The Conference Report states:

" * * * The committee of conference does not intend that this proviso should be construed so as to change the present state of the law with respect to the validity of this specific type of agreement relating to work to be done at the site of the construction project or to remove the limitations which the present law imposes with respect to such agreements. Picketing to enforce such contracts would be illegal under the Sand Door case (Local 1796 [1976], United Brotherhood of Carpenters v. N.L.R.B., 357 U.S. 93 [78 S.Ct. 1011, 2 L.Ed.2d 1186] (1958)). To the extent that such agreements are legal today under section 8(b)(4) of the National Labor Relations Act, as amended, the proviso would prevent such legality from being affected by section 8(e). The proviso applies only to section 8(e) and therefore leaves unaffected the law developed under section 8(b)(4). The Denver Building Trades case and the Moore Drydock cases would remain in full force and effect. The proviso is not intended to limit, change, or modify the present state of the law with respect to picketing at the site of a construction project. Restrictions and limitations imposed upon such picketing under present law as interpreted, for example, in the U. S. Supreme Court decision in the Denver Building Trades case would remain in full force and effect. It is not intended that the proviso change the existing law with respect to judicial enforcement of these contracts or with respect to the legality of a strike to obtain such a contract." [3]

Nor does the addition of a new proviso to clause (4)(B) of Section 8(b) exempting "primary" strikes and "primary" picketing from the ban on secondary boycotts change anything. The Conference Report says of this paragraph:

" * * * The purpose of this provision is to make it clear that the changes in section 8(b)(4) do not overrule or qualify the present rules of law permitting picketing at the site of a primary labor dispute. This provision does not eliminate, restrict, or modify the limitations on picketing at the site of a primary labor dispute that are in existing law. See, for example, NLRB v. Denver Building and Construction Trades Council, et al. (341 U.S. 675 [71 S.Ct. 943, 95 L.Ed. 1284] (1951)); Brotherhood of Painters, Decorators, and Paper Hangers, etc., and Pittsburgh Plate Glass Co. (110 NLRB 455 (1954)); Moore Drydock Co. (81 NLRB 1108); Washington Coca Cola Bottling Works, Inc. (107 NLRB 233 (1953))." [4]

merce', and 'any person' when used in relation to the terms 'any other producer, processor, or manufacturer', 'any other employer', or 'any other person' shall not include persons in the relation of a jobber, manufacturer, contractor, or subcontractor working on the goods or premises of the jobber or manufacturer or performing parts of an integrated process of production in the apparel and clothing industry: *Provided further*, That nothing in this subchapter shall prohibit the enforcement of any agreement which is within the foregoing exception."

3. H.R. No. 1147, 86th Cong., 1st Sess., pp. 39-40, in 1 Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, pp. 943–944. See also N. L. R. B. v. Bangor Building Trades Council, AFL–CIO, 1 Cir., 278 F. 2d 287, 290, note 4. The argument that the third and last proviso of Section 8 (e), supra, Note 2, requires a different result is contradicted by the statement in the Conference Report that "The third proviso applies solely to the apparel and clothing industry." H.R. No. 1147, 86th Cong., 1st Sess., p. 40, in 1 Legislative History, etc., p. 944.

4. H.R. No. 1147, 86th Cong., 1st Sess., p. 38, in 1 Legislative History, etc., p. 942.

Thus, it seems clear on the basis of the admitted facts that the respondent Union has been guilty of an "unfair labor practice," [5] or, at least, that there is substantial ground for so believing. Accordingly, the temporary injunction prayed for will issue.

5. It is, of course, unnecessary to decide whether the Union's conduct also had for its object forcing Talley to recognize it, in violation of the second part of clause (4) (B) of amended Section 8 (b) of the Taft Hartley Act, since one illegal purpose is sufficient to warrant injunctive relief. See National Labor Relations Board v. Denver Bldg. Council, supra, 341 U.S. at page 689, 71 S.Ct. at page 950. The NLRB also charges a violation of clause (4) (A) of Section 8(b) which prohibits coercive measures, the object of which is "forcing or requir-

ing any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e) of this section." But, since it is assumed that the Union already has a contract containing a subcontractor clause, it would not need to obtain another such agreement. Furthermore, the contract in question is not "prohibited by subsection (e)," being specifically exempted from that provision by the first proviso therein. See Note 2, supra.