Ralph E. KENNEDY, Regional Director of the Twenty-first Region of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

CONSTRUCTION, PRODUCTION & MAINTENANCE LABORERS' UNION, LOCAL 383, AFL-CIO, and United Brotherhood of Carpenters and Joiners of America, Local 1089, AFL-CIO, Respondents.

Civ. No. 3563.

United States District Court
D. Arizona.

June 6, 1961.

Milo V. Price, Area Injunction Atty., N. L. R. B., Los Angeles, Cal., for petitioner.

Anderson D. Ward, of Minne & Sorenson, Phoenix, Ariz., for respondents.

KILKENNY, District Judge.

This is a proceeding by the Regional Director of the National Labor Relations Board (herein called Board) under the provisions of section 10(*l*) of the National Labor Relations Act, as amended, (61 Stat. 149, 73 Stat. 544) 29 U.S. C.A. § 160(*l*) (herein called the Act) for a temporary injunction pending the final disposition of the matters here presented which are now pending before the Board on charges filed by the Independent Contractors Association (herein called Association) alleging that respondents have engaged in, and are engaging in, unfair labor practices within the meaning of sections 8(b) (4) (i) (ii) (A) and (B) and 8(b) (7) (C) of the Act, 29 U.S.C.A. § 158. These sections relate to what are commonly known as the "Hot Cargo," "Organizational Picketing" and "Secondary Boycott" segments of the Act.

The respondents are unincorporated associations, labor unions, organized for the purpose of dealing with employers on labor disputes, grievances, wages, rates of pay, hours of employment, conditions of work and other matters. Respondents maintain their offices in Phoenix and each has been engaged within the District in transacting business and in promoting and protecting the interests of its employees. Respondents are not, nor is any other labor organization, currently certified as the representative of any of the employees involved in this litigation.

Colson & Stevens Construction Company, Inc., (herein called Colson) is a general contractor engaged in the construction business in Phoenix. Colson purchased and received goods from sources outside of the state of Arizona in excess of $50,000. At the time Colson was engaged in three construction projects in the Phoenix area: the Yellow Front Project; the Tonto School Project, and the Kiva School Project. The plumbing and heating requirements had been subcontracted to Riggs Plumbing

& Heating Co., (herein called Riggs) and the masonry work was subcontracted to Earl H. (Jack) Haun (herein called Haun). Representatives of the respondents called on Colson about October 14, 1960, and demanded recognition as the representatives of Colson's employees and that Colson enter into a contract with the unions whereby it would be necessary that all subcontractors employed by Colson abide by the terms of the Arizona Master Labor Agreement.[1] Petitioner urges that such Agreement would force Colson to cease doing business with his subcontractors in the event they failed to comply with such Agreement. Respondent Local 1089 commenced picketing operations at the Yellow Front Project on October 19, 1960. The picketing sign read:

"Picket against Colson and Stevens. Carpenters Local 1089 wants to organize and represent the carpenters employed."

The picketing was terminated on the 17th of November, a period of less than 30 days. On January 12, 1961, respondents again interviewed Colson in connection with signing the Master Agreement. Upon refusal, Colson was again picketed for a period of less than 30 days. This picketing was conducted by respondent Local 383. For practical purposes, the sign used by respondent Local 383 was identical with the sign used by Local 1089. The Association, of which Colson was a member, filed the charges with the Board on February 27, 1961, alleging misconduct as aforesaid.

■ When relief is sought under section 10(*l*) of the Act, 29 U.S.C.A. § 160(*l*), it is only necessary for the court to determine whether there is reasonable cause to believe that there has been a violation of the applicable sections of the Act. The ultimate determination on the merits as to whether a violation has actually occurred is reserved exclusively for the Board, subject to judicial review by the Court of Appeals. Madden v. International Hod Carriers', etc. Union, 7 Cir., 1960, 277 F.2d 688. Under this procedure it is not the court's duty to fully inquire into the merits of the controversy, but simply to determine whether there is sufficient substance to the charges to warrant temporary injunctive relief in order to preserve the status quo. N. L. R. B. v. Denver Building Council, 341 U.S. 675, 681–683, 71 S.Ct. 943, 95 L.Ed. 1284. Under the Act the remedy sought in the courts is temporary in nature because it is effective only until the Board, in adversary proceedings before it, determines the correctness or incorrectness of the charges. For this reason, the question before the court, in a proceeding of this character, is not the existence or non-existence of the practices contained in the charges before the Board, but whether in instituting this proceeding the Director "has reasonable cause to believe such charge is true." Kennedy for and on Behalf of N. L. R. B. v. Los Angeles Joint Executive Board, etc., D.C.S.D. Cal.1961, 192 F.Supp. 339, 341.

■ The proceeding under section 10 (*l*) is entirely separate and independent of the proceeding on the merits. N. L. R. B. v. Denver Building Council, supra, 341 U.S. at p. 675, 71 S.Ct. at p. 943. In the proceeding under 10(*l*) it is only necessary that a finding be made that

---

1. Applicable section of Arizona Master Labor Agreement.

"C. That if the Contractors, parties hereto shall subcontract construction work as defined hereafter in Article III of this Agreement, the terms of said Agreement shall extend to and bind such construction subcontract work and provisions shall be made in such subcontract for the observance by said subcontractor of the terms of this Agreement. A subcontractor is defined as any person, firm or corporation who agrees under contract with the general contractor or his subcontractor to perform on the job site any part or portion of the construction work covered by the prime contract, including the operation of equipment, performance of labor and the furnishing and installation of materials. The prime contractor shall comply with the State Law regulating contracting which requires posting of notices."

there is probable cause to believe there has been a violation of the Act or that there may be a violation, and that, on balancing of the conveniences, temporary injunctive relief is proper. Retail, Wholesale & Department Store Union A.F.L.-C.I.O. v. Rains, 5 Cir., 1959, 266 F.2d 503; Douds v. Milk Drivers & Dairy Employees Union, 2 Cir., 1957, 248 F.2d 534. The standard of proof to be applied to this type of a proceeding is much less than that which is necessary to sustain the ultimate findings. Penello v. Wilmington Building & Construction Trades Council, D.C.Del.1959, 177 F. Supp. 413. A decision in this proceeding has nothing whatsoever to do with which party should ultimately prevail. Madden v. International Organization of Masters, etc., 7 Cir., 1958, 259 F.2d 312, 313. A finding of reasonable cause does not require the granting of injunctive relief. That is a matter within the sound discretion of the court. Hecht Company v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754; United Brotherhood of Carpenters and Joiners of America, etc. v. Sperry, 10 Cir., 1948, 170 F.2d 863. However, since public rather than private rights are involved, the doubt should be resolved in favor of effectuating the intent and purpose of Congress with respect to the subject matter. Brown v. Local No. 17, Amalgamated Lithographers, D.C.N.D.Cal.1960, 180 F. Supp. 294, 306–309. The record discloses a sufficient movement of building materials in interstate commerce to give this court jurisdiction. N. L. R. B. v. Fainblatt, 306 U.S. 601, 607, 59 S.Ct. 668, 83 L.Ed. 1014; N. L. R. B. v. Denver Building Council, supra.

## "Hot Cargo" Charge

Respondents are charged with the violation of the National Labor Relations Act, § 8(b) (4) (i) (ii) (A), commonly known as the "Hot Cargo" provision. We are here concerned with the sections of the Act [2] which deal with alleged "Hot Cargo" agreements. The legislative history of the Act [3] discloses, beyond doubt, that the purpose of this particular legislation was to make it an unfair labor practice for an employer to enter into "Hot Cargo" agreements with unions. However, the Senate-House Joint Conference report clearly shows that the legislation was not intended to cover agreements dealing with construction work to be done at the site of construction. 2 U.S.Code Cong. & Adm. News 1959, p. 2511. This legislative history shows that the legislation was enacted to supplement the Taft-Hartley Act in this area of labor-management relations. The petitioner insists that the conduct prohibited by this legislation is the "entering into" an agreement of the type specified in the proviso. It is urged that the proviso:

"Provided, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, al-

2. 29 U.S.C.A. § 158
  "(b) It shall be an unfair labor practice for a labor organization or its agents
      \*     \*     \*     \*     \*
  "(4) (i) to engage in, or to induce or encourage any individual \* \* \* to engage in, a strike \* \* \*; or (ii) to threaten, coerce, or restrain any person \* \* \*, where in either case an object thereof is
  "(A) forcing or requiring any employer \* \* \* to enter into any agreement which is prohibited by subsection (e) of this section;
      \*     \*     \*     \*     \*
  "(e) It shall be an unfair labor practice for any labor organization and any

employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: \* \* \*."

3. 2 U.S.Code Cong. & Adm.News 1959, p. 2441.

teration, painting, or repair of a building, structure or other work:

\* \* \*."

applies only to some *limited voluntary* agreements restricting the business relations of employers in the building industry. In support of his argument, petitioner cites a number of references to the legislative history of the Act which might indicate that 8(e) was not intended to change the existing law under 8(b) (4). This argument is sound to the extent that Congress did not intend to change the decisional law as formulated under 8(b) (4) in the Sand Door case. Local 1976, United Brotherhood of Carpenters, etc. v. N. L. R. B., (1958), 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186. However, petitioner is urging a separate violation of the 1959 "Hot Cargo" legislation under the provisions of (A) (e). It is quite obvious that Congress, when enacting (A) intended to proscribe only those agreements which were prohibited by subsection (e). This is the direct mandate of the legislation. Subsection (e) expressly excepts from the scope of its prohibitions those building and construction contracts and subcontracts such as here involved. The language is so clear and unequivocal that there is no reason to invoke the ordinary rules of statutory construction, nor for that mat-

ter any particular reason to use or invoke the Congressional history of the legislation.

On April 14, 1961, Judge Wright of the United States District Court for the Eastern District of Louisiana, in the case of LeBus v. Plumbers Local 60, 193 F.Supp. 392, rejected the identical contention which is here urged by petitioner and held that there was no merit in the argument of the National Labor Relations Board that this proviso of subsection (e) merely sanctioned voluntary agreements into a "Hot Cargo" agreement in the construction industry, but did not lift the ban on coercive measures designed to force such a stipulation from an employer. While I do not fully agree with some of the language used by Judge Wright, I am convinced of the soundness of his ultimate conclusion.

Petitioner has failed to show a prima facie violation of section (A).

### "Organizational Picketing" Charge

As a second ground for relief petitioner charges that respondents violated the "organizational picketing" section of the Act.[4] Organizational picketing is generally known as picketing which is designed to compel employees to join a union and designate it as their bargaining agent. Section 8(b) (7) was

---

4. "It shall be an unfair labor practice for a labor organization or its agents

\* \* \* \* \*

"(7) to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:

\* \* \* \* \*

"(C) where such picketing has been conducted without a petition under section 159(c) of this title being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing: Provided, That when such a petition has been filed the Board

shall forthwith, without regard to the provisions of section 159(c) (1) of this title or the absence of a showing of a substantial interest on the part of the labor organization, direct an election in such unit as the Board finds to be appropriate and shall certify the results thereof: Provided, further, That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public, (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services.

"Nothing in this paragraph (7) shall be construed to permit any act which would otherwise be an unfair labor practice under this subsection."

one of the amendments adopted by Congress in 1959 to correct what it considered were certain deficiencies in the then existing Act, one of which was the absence of adequate restrictions on picketing where used for organizational purposes. Three subdivisions of section 8 (b) (7) should be considered together, and when so considered, it seems obvious that the section was carefully designed as a plan to promulgate the orderly solution of disputes over representation of employees by directing that such problems be settled in accordance with the Board's procedures in lieu of coercive picketing. The legislative history of the 1959 amendments clearly demonstrates that section 8(b) (7) (C), in its present form, is a compromise between sharply conflicting congressional views. This legislation authorizes a union to engage in picketing for a reasonable length of time, but not more than thirty days, in an attempt to secure sufficient employees to force recognition, or to secure recognition if it represents the employees. After such period the legislation prohibits picketing unless proceedings have been initiated by the filing with the Board for an election to determine whether, in fact, the union does represent the employees and is entitled to recognition.

There is substantial evidence that respondents were acting in concert and with one purpose in mind when their representatives held meetings with Colson on October 14, 1960 and January 12, 1961. They jointly demanded that Colson become a signatory to the Arizona Master Labor Agreement. This would have meant automatic recognition of both respondents as the collective bargaining representatives of Colson's employees in the appropriate unit. There is no claim that respondents presented Colson with separate collective bargaining agreements nor did they in fact bargain separately with Colson. In such case each would be entitled to picket for thirty days. However, their efforts were joint and collective. Their purpose was joint and collective. A few days after their collective demand in October 1960, Local 1089 commenced picketing. A few days after January 12, 1961, the date of the second meeting, Local 383 commenced picketing. I find that there is reasonable cause to believe that the respondents were acting jointly and in concert with and in support of each other's demands and that the picketing of Colson in the manner shown by the record in support of the respondents' joint and collective demands that Colson become a signatory to such Master Labor Agreement exceeded the thirty days allowed under the provisions of section 8 (b) (7) (C). This conclusion does not contravene the provisions of section 13 of the Act. Truck Drivers & Helpers v. N. L. R. B., 1957, 101 U.S.App.D.C. 420, 249 F.2d 512.

"Secondary Boycott" Charge

The third charge against respondents is that they jointly and in concert with each other violated what are known as the "Secondary Boycott" provisions of the Act.[5] This [5] is another

5. 29 U.S.C.A. § 158 (§ 8(b) (4) (B)).
  "(b) It shall be an unfair labor practice for a labor organization or its agents
      *      *      *      *      *
  "(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any

person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is
      *      *      *      *      *
  "(B) forcing or requiring any person to cease using, selling, handling, transporting or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative

1959 amendment to the Act. The language of its predecessor, which was then known as 8(b) (4) (A), was, for the purposes of this decision, practically identical with this section. In substance this section attempts to confine the effects of an industrial dispute to those who are immediately interested and to prevent the extension of such a dispute to those employers and employees who are not directly involved. There is substantial testimony in this case that one of the objects of the picketing was to obtain Colson's approval of the Master Labor Agreement containing a subcontractor clause requiring all subcontractors to comply with the provisions of such Agreement. This type of activity was prohibited by the Act before the 1959 amendment. N. L. R. B. v. Denver Building Council, supra. The legislative history of the 1959 amendments clearly shows that Congress did not intend to change the rule as announced in the Denver Building Council case.[6]

The sole object of the picketing need not be the termination of the subcontractors' contract. N. L. R. B. v. Denver Building Council, supra, 341 U.S. at 689, 71 S.Ct. at 951. A strike against a general contractor by a union to require the subcontractor to observe union standards is an unfair labor practice within the provisions of the former section, with which this legislation is practically identical. N. L. R. B. v. Bangor Building Trades Council, 1 Cir., 1960, 278 F.2d 287; United Brotherhood of Carpenters v. N. L. R. B., 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186. Since picketing to enforce the provisions of such an agreement is prohibited by the Act, it naturally follows that picketing to obtain such an agreement would likewise be prohibited. It is obvious that if Colson could be forced to cancel its contracts with the non-union contractors, the latter would then be under compulsion to sign the Master Agreement. A clear inference to be drawn from the record is that an object of the picketing was to force the non-union contractors to recognize and bargain with a union signatory to the Master Agreement, even though such union was not the certified bargaining representative of the employees. Picketing may not be used against one employer to change working conditions with another employer where, as in the present case, such change is attempted to be accomplished through a disruption of business. N. L. R. B. v. Washington-Oregon Shingle Weavers, 9 Cir., 1954, 211 F.2d 149; Superior Derrick Corporation v. N. L. R. B., 5 Cir., 1960, 273 F.2d 891. I have already said, and I find, that a principal object of the picketing was to compel Colson to become a signatory to the Master Agreement. The necessary effect of the picketing to obtain Colson's signature involved other employers who were not parties to the dispute. This Master Agreement required the subcontractors to comply with each and all of its terms. This Agreement clearly prohibited Colson from doing business with those who failed to comply with its terms.

■ I find that there is reasonable cause to believe that respondents violated the "Secondary Boycott" provisions of the Act.

Counsel for petitioner shall prepare, serve and present findings and a decree of injunction in conformity herewith.

of such employees under the provisions of section 159 of this title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;"

6. Congressional Conference Report. " * * This provision does not eliminate, restrict, or modify the limitations on picketing at the site of a primary labor dispute that are in existing law. See, for example, N. L. R. B. v. Denver Building & Construction Trades Council, et al., (341 U.S. 675 (1951) [71 S.Ct. 943]) * * *." 2 U.S.Code Cong. & Adm. News, 1959, p. 2510, 2511.