Anthony **IODICE** et al., Plaintiffs,

v.

Peter **CALABRESE**, individually and as Secretary Treasurer of Teamsters and Chauffeurs Local No. 456, International Brotherhood of Teamsters, Defendants.

No. 67 Civ. 887.

United States District Court,
S. D. New York.

June 6, 1972.

Greenspan, Aurnou & Davis, by Leon Greenspan, White Plains, N. Y., for plaintiffs.

John J. Sheehan, New York City, for defendants.

EDELSTEIN, Chief Judge.

## OPINION

This case raises claims by individual truckers and trucking companies of having been prevented from freely conducting their businesses in the construction industry in Westchester County, New York, by the unlawful and wilful activities of a local union and one of its officers. This case was tried to the court without a jury, and the facts adduced in

evidence, relating to a period of over twenty years, raise complex issues of law. The court has jurisdiction over this case pursuant to 28 U.S.C. § 1337 (1964), 29 U.S.C. §§ 185, 187 (1964), and pursuant to its pendent jurisdiction. Iodice v. Calabrese, 291 F.Supp. 592 (S. D.N.Y.1968).

Plaintiffs Anthony Iodice and Thomas Valentine have worked in the construction industry in Westchester County as truck drivers. Both have owned and operated their own equipment. Plaintiff Thornwood Excavators and Movers, Inc., (Thornwood) is a New York corporation which was engaged in trucking operations—primarily the moving of heavy construction equipment from one site to another—in the construction industry in Westchester County. Iodice's sister, Elissa Giuliano, owns Thornwood and Iodice himself worked for Thornwood as a manager and truckdriver. Plaintiff Pelham Transportation Company, Inc., (Pelham) is another New York corporation which was engaged in Westchester County in the business of moving heavy construction equipment. It is owned by plaintiff Bart Ruggiero. Plaintiff Judy Capece owned a restaurant located in Westchester County. The only evidence offered in connection with her claim was stricken from the record without objection at the end of plaintiffs' case, and her claims, therefore, are dismissed.

Defendant Peter Calabrese was the Secretary-Treasurer of Teamsters and Chauffeurs Local No. 456, International Brotherhood of Teamsters (Local 456).[1] This local has its office in Westchester County. Its membership includes truck drivers who work in the construction industry in that county.

Iodice and Valentine once were members of Local 456 as owner-drivers, that is, as men who owned and drove their own trucks. Iodice was a member in 1948 and 1949 and Valentine was a member from 1946 to 1949. In 1949 Local 456 members who were owner-drivers were called to a union meeting by John Acropolis, who then was president of the union. They were informed that they could not retain their status as union members but that they could sign contracts as truck owners with the union.[2] Of approximately 200 owner-drivers, some signed contracts with the union, but most, including Iodice and Valentine, did not. In consequence Iodice and Valentine were disassociated by the union.

In 1950 both Iodice and Valentine went to work as drivers for E. Rabinow & Company, a business located in Yonkers, New York. At this time Local 456 was engaged in a strike against this company. In the course of their employment, Iodice and Valentine drove through the union picket lines. During their employment they also witnessed an assault upon Albert Rabinow by Peter Calabrese. Calabrese subsequently was indicted for this offense along with two other union members, Harry Williams and Carl De Marco. Iodice and Valentine testified for the prosecution at the trial of these three men in October 1951. All three were convicted and Calabrese subsequently served approximately nine months in prison. At this time Calabrese was a business agent of Local 456. He was elected Secretary-Treasurer of the union in about 1961.

Valentine quit his employment with E. Rabinow & Company some time before the conclusion of Local 456's strike against that company. Since then Valentine has been engaged in the construction industry doing excavation work

---

1. Peter Calabrese died after the conclusion of the trial. On July 6, 1971, Adele Calabrese, as executrix of his estate, was substituted as a defendant in his stead on the motion of the plaintiffs pursuant to Rule 25, F.R.Civ.P.

2. The record is not precisely clear as to why the union took this action. Apparently there were at least two factors involved: (a) complaints from the other union members that the owner-drivers worked too cheaply and thereby deprived the other men of work; and, (b) unspecified antitrust problems involved in organizing both truck drivers and truck owners.

and hauling machinery as an owner and operator of his own equipment. Valentine has operated his business without a Local 456 contract or membership. As a consequence, he testified, he has suffered business interruptions over the years due to the refusal of union members to permit him to work on the same job with them. Also, generally, he has had to stay out of Westchester County when engaged in hauling because of his non-union status.

After leaving the employ of E. Rabinow & Company, Iodice also went into business for himself. He purchased a dump truck and used it to haul dirt, blocks, bricks and other material. Contractors on union jobs, however, let him go soon after he started work on the grounds that he was not union. After about three or four years Iodice bought a low-bed trailer and tractor and went into the business of moving heavy machinery. Iodice remained in this business under his own name until January of 1965. He sold his equipment then to Thornwood Excavators and Movers, Inc., a corporation formed at this time by Iodice's sister, Elissa Giuliano, as owner. Aside from these changes of form, the business remained the same with Iodice in charge acting both as manager and truck driver.

During the years following 1949 neither Iodice nor Thornwood operated with a Local 456 contract.[3] On July 1, 1966, Thornwood, by Elissa Giuliano, signed a contract with Local 445, a different Teamsters affiliate having jurisdiction over various counties in New York outside of Westchester. Also, in 1968, Thornwood signed a contract with Local 465, Amalgamated Truck Owners, Drivers and Helpers Union. This was the union that Iodice helped to form. He became its treasurer and business agent. Though organized on paper, this union never developed into a viable organization. Efforts to make it such ceased after approximately four or five months.

Under whichever form of business Iodice operated, the fair preponderance of the credible evidence establishes that at various times he lost business because of pressure brought to bear upon his customers by Local 456 and Calabrese not to deal with him. At times this pressure took the form of warnings of possible labor trouble and job stoppages if Iodice's services were used. At other times the union levied fines in varying amounts in the form of assessments which had to be paid to designated charities by contractors who hired Iodice to move their machinery. More will be said later about the nature of these fines and the claimed authority to levy them; at the moment the court turns to some of the examples revealed by the evidence of disruptions of Iodice's business. Whether these disruptions were the result of unlawful activity also will be discussed later.

Beginning in 1957, Dominick Clemente, a contractor in the heavy construction business employed Iodice to move his equipment. In 1966 or 1967, while under contract with Local 456, Clemente was told by Calabrese not to use Iodice or else his jobs would be shut down. Clemente stopped using Iodice. Thereafter, in 1967, Clemente hired Iodice again after Iodice said that since he had a contract with the union in Rockland County he could move machinery from Rockland into Westchester. Calabrese learned about this. He told Clemente that Iodice did not have a contract in Westchester County. Clemente was fined $1000 payable to a missionary named Brother Flavian on the asserted ground that Clemente's use of Iodice constituted a violation of his contract with Local 456. After this fine was imposed Clemente stopped using Iodice.

Peter Celona, an excavating contractor, had used Iodice to move his machinery for about fifteen years. In May of 1968 Celona had a contract with Local 456. He testified he knew that he was not supposed to use Iodice. However, he

3. In 1966 Thornwood negotiated with Calabrese about signing a contract with the union. This negotiation will be described *infra.*

hired Iodice anyway because he had to move some machinery and could not get another trailer. Calabrese fined Celona approximately $120 for using Iodice. Celona had to pay the fine to Brother Flavian.

Louis Di Falco, an excavating contractor, first started doing business with Iodice in 1962 or 1963. Before starting a new job in 1968 he was told by Calabrese's delegate to go to see Calabrese because the job was supposed to be strictly union. At the union hall Calabrese told Di Falco that unless he signed a contract with the union he would not be able to start work or have any machine moved onto the job. At the time Di Falco had a contract with another union, the operating engineers, but he signed the Local 456 contract as well so that he could start his job. At this meeting Calabrese told Di Falco that he could not use Iodice to move his machinery, he only could use Local 456 men. Di Falco stopped using Iodice.

Joseph Luciano, Jr., does business as Tuckahoe Construction Company, Inc. He employed Iodice to move his equipment. In 1966, while Iodice was making a move for him, he received a telephone call from Calabrese who said that if Iodice moved the machine it would cost Luciano a fine of $1000. Luciano thereupon got in touch with Iodice in the middle of the move and ordered Iodice to return the machine to Luciano's yard. Luciano never used Iodice again. At the time of this incident Luciano had a contract with Local 456.

Kenneth Chiarito is engaged in the house wrecking business under the name Kenbar Demolition Contractors. He first used Iodice to move his equipment in 1966 but has not used him since 1968 because Chiarito purchased his own trailer at that time. In 1966 or 1967 he used Iodice to move his equipment to a demolition job he was engaged in at a site across the street from the Local 456 union hall. Chiarito did not have a contract with Local 456 at that time although he had been hired by a contractor who did have such a contract. Calabrese came over to the job site. He told Chiarito that he would not be paid for the job unless he signed a contract with the union. He also fined Chiarito one day's pay for using Iodice. Chiarito afterwards signed a contract with the union.

The evidence establishes that other contractors were fined by the union for employing Iodice to move construction equipment for them.

Local 456 claims that its secretary-treasurer and business agents have the right to impose fines on contractors whenever they alone, in their discretion, decide that a contractor has breached his contract with the union. This practice of levying fines is not provided for in any contract, constitution, by-law, or regulation. Rather, it is a practice that apparently is sanctioned only by long usage and cavalierly is justified by the union on the grounds that a contractor would prefer to pay a sum of money to charity rather than suffer the consequences of a strike. In fact, lurking behind every imposition of a fine is the threat of a strike in the event the contractor refuses to abide by the union's assessment. As one might expect, no contractor ever has refused to pay a fine imposed upon him. The magnitude of a particular fine is a discretionary matter determined by the union official imposing it and dependent at least in part upon a contractor's record of compliance with union requirements. There is no opportunity for appeal. A contractor either pays or suffers the consequences. Finally, while Calabrese testified that fines are imposed only on contractors who have contracts with Local 456, the president of the union, John Leggio, testified that the power to fine extended to contractors who did not have contracts with Local 456. In fact, the fine assessed against Kenneth Chiarito was imposed even though Chiarito did not have a Local 456 contract when the claimed violation occurred, that is, when Chiarito used Iodice to move machinery onto Chiarito's job site.[4]

4. The record shows that between 1960 and 1969 the total amount of fines imposed by the union was $19,771.83. None of the contractors who were fined have

Iodice no longer works for Thornwood. At the end of 1968 or the beginning of 1969 Pleasant Excavators and Equipment Rental Company, Inc., another corporation owned by Iodice's sister Elissa Guiliano, was organized. Pleasant's business is the same as was Thornwood's. Here, too, Iodice works for Pleasant as a manager and truck driver, just as he did for Thornwood. Again, while the form changed, the business remained the same with Iodice in charge.

Iodice, Thornwood and Pleasant all have had the same business address, namely, 10 Walnut Place, Thornwood, New York. The owner of these premises is Bart Ruggiero, a long-standing friend and financial benefactor of Iodice. Ruggiero also owns a liquor store; prior to 1965 he had never conducted any kind of trucking business.

Early in 1965 Iodice brought to Ruggiero's attention the fact that Pelham Transportation Company, Inc., was being offered for sale. Pelham held certificates of public convenience and necessity issued to it by the Interstate Commerce Commission and by the New York State Public Service Commission, certificates beneficial to an operator of a trucking business. (Iodice never had the benefit of such certificates.) On March 12, 1965, Iodice entered into a contract purchasing Pelham. He did so for Ruggiero's benefit although the contract of purchase gives no indication that Iodice was acting as an agent.

At about the time Iodice purchased Pelham for Ruggiero, he called the Local 456 union hall for leave to come down to discuss a contract. That evening he met with two business agents of the union, Samuel Trilto and Dominic Revellese. Calabrese joined the meeting later. At the meeting Iodice stated that he was buying "rights" and that he wanted to sign a contract with the union. He also wanted the union to accept two employees

he had as members. Calabrese indicated that the men would be accepted provided he had the right to interview them first. Iodice took copies of the union contract with him, saying that he wanted to let his lawyer look at them.

Iodice returned to the union hall on April 9, 1965, with Ruggiero. There, though Ruggiero was introduced as the financier and principal officer of Pelham, at Calabrese's behest it was Iodice who signed a contract with Local 456 on behalf of Pelham. At this time Iodice again mentioned his two employees, identifying them as Nicholas Tramonti and Joseph Nicolai, whom he wanted to join the union and work for Pelham. Calabrese agreed to accept them, again stating that he wanted to interview them beforehand. Before leaving the union hall Iodice was given various reporting forms to be used in making payments to the union's welfare, pension and severance funds. He also was given a form which was to have been filled out and returned to the union for forwarding to the New York Workmen's Compensation Board.

Pelham's business was the same as Thornwood's. Indeed, Pelham shared the same office with Thornwood; only a partition separated the two. Ruggiero spent very little time at Pelham's office; a business manager, Frank Locascio, ran the business for him. In addition, while Iodice did not have a formal position with Pelham, yet as a friend and adviser of Ruggiero, and as one whose own business was located on the same premises as Pelham's, he aided Pelham's operations. Whenever Pelham's bookkeeper needed help Iodice estimated, that is, calculated the appropriate price for a particular move. This was done by Iodice for about fifteen percent of all of the moves made by Pelham. Too, he often told Pelham's drivers which routes to take on their moves and how best to load the machinery. The drivers were the two men

joined in this action, nor, apparently, have any of them brought any action at all protesting the fines imposed upon them. Still, it is not out of place to note that it has been held by a state

court that a strike to enforce a fine payable to a charity is unlawful. Building Trades Council v. Thompson, 68 Nev. 384, 234 P.2d 581 (1951).

who formerly had worked for Iodice and Thornwood and who since had been taken into the union.

One of these men, Joseph Nicolai, subsequently was fired. He complained to Calabrese. Calabrese went to Pelham's office early in the morning and complained about this and about the fact that some pay was owed to Nicolai. Iodice was there at the time. It was he who discussed the matter with Calabrese. In the end Iodice used his own personal traveler's checks to pay Nicolai the amount owed him, because, as he testified, Pelham's bookkeeper had not yet reported for work.

On November 5, 1965, Local 456 commenced picketing Pelham's premises with placards that read "Pelham Transportation did not observe contract."

In a meeting with Ruggiero at the union hall some days after the picketing began Calabrese explained to Ruggiero that Pelham's failure over the months to make the fringe benefits payments required by the union contract was the reason for the picketing. Calabrese did not give a statement as to the amounts involved, but Ruggiero agreed to pay whatever was owed. Later he instructed his bookkeeper to make the necessary payments. Pelham sent five checks to the union, all dated December 17, 1965. Calabrese returned these checks with a covering letter dated December 20, 1965, claiming that the amounts sent were inadequate. In addition to the claims made for welfare, pension, and severance payments, Calabrese also claimed at this time that $1323 was due to Tramonti for pay for the seven weeks since the picketing began that Tramonti had not worked. Calabrese testified that this money was due to Tramonti because during this period Tramonti had not worked and Iodice, in violation of the union contract, had driven for Pelham. Indeed, when testifying, Calabrese asserted as a second reason for the picketing that Iodice previously had driven Pelham's truck, something only a Local 456 member was permitted to do. The amount claimed

by Calabrese as pay owed to Tramonti was increased as time went by until Tramonti went to work for another company.

Other meetings were held between Ruggiero and Calabrese following the latter's rejection of the checks tendered by Pelham. None of these attempts to settle the dispute were successful; the picketing continued for approximately two years. All during this period Pelham was unable to do any work. About a year after the picketing began Ruggiero sold Pelham's equipment. Subsequently Pelham's certificate of public convenience and necessity from the Interstate Commerce Commission was revoked because Pelham did not maintain its insurance. While the corporation has not been dissolved and while it still retains the certificate of public convenience and necessity issued by the New York State Public Service Commission, Pelham no longer is in business.

While Pelham still was being picketed, sometime during the spring or summer of 1966, Iodice, his sister Elissa Giuliano, and their attorney, Mr. Lomuscio, met with Calabrese at his office. Mrs. Guiliano wanted Thornwood to sign a contract with Local 456, and, at the same time, she wanted Iodice to be permitted to drive Thornwood's truck. Calabrese refused, saying that as a manager Iodice could not belong to the union and therefore could not drive a truck. Also, Calabrese said that Pelham's obligations first would have to be settled before any contract could be signed. In this connection Calabrese maintained then and testified at trial that when the contract with Pelham was signed it was understood that all of Iodice's businesses were covered by the Pelham contract. At trial Iodice denied this. The contract itself, defendants Exhibit A in evidence, only refers to Pelham Transportation Co., Inc., and not to any other business entity. Only Pelham can be found to be bound by the contract with the union.

Further explication of the factual background of this suit will be required later, but enough has been said by this

point to permit a change of focus. Now to turn to the legal questions raised by this suit.

Five separate causes of action, all predicated on the same factual allegations, are enumerated in the complaint filed in this action. Briefly they allege the following: first, a violation of section 340 of the New York General Business Law, McKinney's Consol.Laws, c. 20; second, a violation of the New York common law against secondary picketing and boycotting; third, a violation of section 303 of the Labor Management Reporting and Disclosure Act of 1959; fourth, breach of Pelham's labor contract with Local 456; and, fifth, violation by Calabrese of the fiduciary duties owed by him under New York law to Local 456. In their closing argument plaintiffs withdrew their first and fifth causes of action, and at the conclusion of all of the testimony plaintiffs moved to conform their complaint in several respects to the evidence adduced.

The first amendment sought by plaintiffs is one that replaces the statutory reference made in the third cause of action with a citation to section 303 of the Labor Management Relations Act as amended in 1959, 29 U.S.C. § 187 (1964).[5] Defendants offer no objection to this amendment and it is granted.

Plaintiffs also asked leave to conform their complaint to the evidence by adding a claim that Local 456's conduct violated the Sherman and the Clayton Anti-Trust Acts, and by adding a claim that defendants unlawfully interfered with and induced the breach of contractual relations enjoyed by the plaintiffs.[6] The court is of the opinion that both of these proposed amendments should be granted.

Defendants objected at the trial when plaintiffs sought to elicit testimony regarding antitrust violations. Plaintiffs indicated in response that they would seek leave to amend their complaint to include antitrust claims. Plaintiffs' motion thus must be considered within the context of the second part of Rule 15(b) F.R.Civ.P., the part which is concerned with amendments made in response to objections to evidence. [The whole of this rule is set out in the margin.][7] There it is indicated that motions of this type should be granted freely unless the presentation of the merits of the case

---

5. The Labor Management Reporting and Disclosure Act of 1959, originally cited in the complaint, refers to the activities of a labor organization under trusteeship. The new citation is to that provision which makes it unlawful for a labor organization to engage in unfair labor practices.

6. Plaintiffs also moved for leave to conform their complaint to the evidence by labelling a cause of action for economic duress and by labelling the fines imposed by the union as extortion in violation of the New York Penal Law. However, inasmuch as plaintiffs did not argue in their concluding oral argument or in their post-trial brief economic duress or extortion as separate, independent claims, the court treats these theories simply as additional arguments made by plaintiffs in support of their various claims. Hence, a separate ruling on this part of plaintiffs' motion to conform their pleadings to the evidence is not indicated.

7. Rule 15(b) Fed.R.Civ.P. reads as follows:

Amendments to Conform to the Evidence. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

would not be subserved thereby and unless the defendants satisfy the court that the admission of the evidence (and the consideration of the issues raised by the evidence) would prejudice them in maintaining their defense on the merits.

 Arguing that plaintiffs' antitrust amendment should not be permitted, defendants point to the fact that plaintiffs delayed nearly until the very end of the trial, until defendants' case nearly was complete, before bringing their antitrust theory to the attention of the court and of the defendants. Also defendants claim surprise. It is incumbent on the defendants, though, to show actual prejudice, to demonstrate some undue disadvantage suffered by them in the presentation of the merits of their defense because of the amendment, for the court to exercise its discretion in their favor and deny plaintiffs' motion. Deakyne v. Commissioners of Lewes, 416 F.2d 290, 300 (3rd Cir. 1969); 6 Wright & Miller, Federal Practice and Procedure § 1495 (1971). No such showing has been made. Approximately six weeks intervened between the time plaintiffs made their motion to amend and the time closing arguments were heard. Defendants thus had ample time to research the legal issues raised by plaintiffs' antitrust claim. In fact, both in their closing argument and post-trial brief defendants presented their view of these issues. Moreover, in all this time defendants never asked for a continuance or an opportunity to present new evidence relating to the antitrust claims. Such a request clearly would have been proper under Rule 15(b). Defendants' failure to make the request persuades the court that defendants suffered no prejudice in presenting their case. *See,* Stiles v. Gove, 345 F.2d 991, 994 (9th Cir. 1965); Fidelity & Deposit Co. of Maryland v. Krout, 157 F.2d 912, 913 (2d Cir. 1946); Rabenovets v. Crossland, 78 U.S.App.D.C. 54, 137 F.2d 675 (1943).

 Finally, defendants argue that the antitrust amendment should not be allowed because in fact there is no evidence in the record to support the anti-trust claim. The short answer to this, however, is that Rule 15(b) was intended to promote decisions on the merits of the issues and not upon the pleadings. Whether or not plaintiffs' antitrust claim has been sustained will be considered later, but at this juncture it is sufficient to say that there is no valid reason why the amendment should not be allowed.

 Also, there is no reason why plaintiffs should not be allowed to denominate a cause of action for interference with contract. Plaintiffs contend that the union's imposition of fines and use of other tactics to discourage contractors from availing themselves of plaintiffs' services constitutes tortious interference. The conduct attacked here was alleged in the complaint from the outset. No objection was made when evidence of it was adduced at the trial. Defendants were directly apprised in plaintiffs' opening statement and again at the conclusion of plaintiffs' case that plaintiffs were pursuing a recovery for interference. No objection was made at either time. In fact, defendants never have made a specific objection to this particular amendment by the plaintiffs. This amendment is proper and is allowed.

Section 303 of the Labor Management Relations Act as amended in 1959, 29 U.S.C. § 187 (1964), provides that:

(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b) (4) of this title. [and]

(b) Whoever shall be injured in his business or property by reason or [sic] any violation of subsection (a) of this section may sue therefor . . . and shall recover the damages by him sustained and the cost of the suit.

Plaintiffs contend that defendants have committed an unfair labor practice against Iodice and Thornwood in violation of 29 U.S.C. § 158(b) (4) (ii) (B)

(1964) which provides in relevant part that:

(b) It shall be an unfair labor practice for a labor organization or its agents—

. . . (4) . . . (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

. . . (B) forcing or requiring any person . . . to cease doing business with any other person . . . Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.

This is one of the provisions of the law aimed at secondary boycotts.

Citing Webster's New International Dictionary, one court in an opinion has said that to threaten is to express an intent to "inflict evil or injury on another;" to coerce is to "compel to any action" and restrain is to "limit, confine or restrict." Herbert Burman, Inc. v. Local 3 International Brotherhood of Electrical Workers, 214 F.Supp. 353, 359 (S. D.N.Y.1963). By fining contractors for using Iodice and by warning them of labor trouble if they continued to use Iodice, defendants have employed threats, coercion and restraints resulting in the loss of business by Iodice. Defendants counter, however, that their actions constituted justified and lawful primary activities designed, not to force contractors to cease doing business with Iodice, but to enforce valid contractual provisions preserving work for their members and maintaining the union standards of wages, hours and other conditions of employment in the industry.[8]

At the time they were fined each one of the various contractors (except Chiarito) had a contract with Local 456. Article VII of the contract, entitled Extra Equipment, provided:

In the event the Employer hires additional equipment from employers not under contract with the Union, his employees shall operate such equipment if they are not otherwise assigned to work but, in any event, such hired equipment shall be operated by an employee in accordance with the provisions of this agreement.

Article XIII of the contract, entitled Outside Contracts, provided:

The Employer shall not, during the term of this agreement, contract or agree to contract or otherwise assign, work performed by employees covered by this agreement to any other firm, contractor, corporation, partnership, individual or otherwise, except as provided by Article VII hereof. It is agreed that employees covered by this agreement shall continue to do all types of work heretofore performed by them. The Employer shall use employees covered hereby to move cranes, cats or shovels. However, if an independent contractor is engaged for such work, he shall perform the same under conditions not less favorable than those contained herein.

The effect of these provisions, defendants contend, is that a contractor having a contract with Local 456 may not employ a non-union contractor to move construction equipment for him unless the cost of labor to the non-union contractor is no less than the cost would be to a union contractor, including the cost of all fringe benefits provided for in the union contract. Application of this formula,

---

**8.** No contention has been made that the alleged secondary employers, that is, the construction contractors who employed Iodice and consequently were threatened and fined, were not engaged in an industry affecting commerce or that the effect of the alleged secondary activities did not burden or obstruct commerce. *See* N. L. R. B. v. International Union of Operating Engineers, Local

571, 317 F.2d 638, 642–643 (8th Cir. 1963); Sheet Metal Workers International Ass'n Local 299 and Allen Stout, 131 N.L.R.B. 147 (1961). Iodice himself made moves into New Jersey and Connecticut. *See*, Herbert Burman, Inc. v. Local 3 International Brotherhood of Electrical Workers, 214 F.Supp. 353, 357 (S.D.N.Y.1963).

it is argued further, forbade the employment of Iodice by contractors bound by the union contract because Iodice did not pay his men union-scale wages. This last is shown, it is said, by Iodice's admission, made when testifying in court about Pelham's costs of operation, that he calculated Pelham's wage costs to be about twenty percent more than his wage costs were when he operated in his own name.[9] Hence, defendants conclude, the steps they took against the contractors to enforce the contracts with them were proper because they were engaged in protected primary activity.

One can assume *in arguendo* that enforcement of the union's contract may have been an object of Calabrese and the union when they imposed their fines and threatened contractors with possible future labor troubles for using Iodice. However, what must be determined here is whether defendants were motivated by any other objects. If so, and if one of those other objects is proscribed by the statute, then their actions were unlawful.

[6] Section 158(b) (4) '(ii) (B) proscribes a union's employment of threats, coercion, or restraint against an employer if an object of the union is to force that employer to cease doing business with any other person. To find a violation of this provision the evidence need not show that the unlawful object was the sole object pursued by the union. *E. g., N. L. R. B. v. Denver Building and Construction Trades Council*, 341 U.S. 675, 689, 71 S.Ct. 943, 95 L.Ed. 1284 (1951); *Local 74, United Brotherhood of Carpenters & Joiners v. N. L. R. B.*, 341 U.S. 707, 713, 71 S.Ct. 966, 95 L.Ed. 1309 (1951); *N. L. R. B. v. New York Lithographers & Photo-Engravers Union No. One-P*, 385 F.2d 551, 555 (3rd Cir. 1967); *N. L. R. B. v. Milk Drivers and Dairy Employees Local 584*, 341 F.2d 29, 32 (2d Cir.) cert. denied, 382 U.S. 816, 86 S.Ct. 39, 15 L.Ed.2d 64 (1965);

*N. L. R. B. v. Wine, Liquor & Distillery Workers Union Local 1*, 178 F.2d 584, 586 (2d Cir. 1949). It is sufficient to find that one of the objects of the defendants was to force the contractors to cease doing business with Iodice. If this is found, it is no defense that at the same time the defendants also sought to enforce the union contract.

The fact that a union may have grounds for a dispute with each of two separate employers does not permit the union to employ in one dispute tactics designed for their effect in the other dispute. Each of the two employers may not be neutral in the sense that each has a dispute with the union, but each is neutral as to the other's dispute and may not be involved in it by the union. And so the fact that one employer (here the contractor who used Iodice) possibly may have breached his contract with the union does not permit the union to threaten or coerce that employer with the object of forcing him to cease doing business with another (here Iodice). A contract may not be enforced by conduct which violates section 158(b). For example, in *N. L. R. B. v. International Union of Operating Engineers, Local 12*, 293 F.2d 319 (9th Cir. 1961), a strike of a construction job was held to be a secondary boycott when it was found that an object of the strike was to force the general contractor to cancel its contract with a subcontractor notwithstanding the union's claim that the general contractor by hiring the subcontractor, breached the union contract. Similarly, in *Lebus, for and on Behalf of N. L. R. B. v. International Union of Operating Engineers, Local 406*, 188 F.Supp. 392 (E.D.La.1960), a case involving the same general fact pattern, a purported breach of a contract against subcontracting with a non-union firm did not shield the union once it was found that an object of its picketing was to force the non-union

---

9. Plaintiffs construe Iodice's testimony differently, arguing that all Iodice said was that Pelham's wage costs in 1965 were about twenty percent greater than his own labor costs were in 1963. Whatever Io-

dice's disputed statement was intended to mean, the record does reflect that both Tramonti and Nicolai were paid more in 1965 when they transferred from Thornwood to Pelham and joined the union.

firm off the job. *Accord,* N. L. R. B. v. New York Lithographers & Photo Engravers Union No. One-P, *supra*; N. L. R. B. v. *Milk Drivers and Dairy Employees Local 584, supra.*

The evidence in this case impels the conclusions that the defendants did not act simply to enforce the union contract but intended to disrupt Iódice's business as much as possible.

And so, throughout the trial the defendants insisted, one, that the employment of Iodice by a contractor meant an erosion of union standards and thereby a threat to the job security of union members, and, two, that they had a right to combat this situation. Reliance is placed in their brief on the case of *Pazan Motor Freight, Inc.* v. *Teamsters,*[9a] 73 LRRM 2293 (E.D.Mich.1970) (*but see* NLRB v. *Carpenters District Council,* 439 F.2d 225 (8th Cir. 1971). There is no need to dwell on *Pazan* since it is altogether inapplicable to the facts concerning Iodice's dispute with defendants.

For approximately twenty years deeply held feelings of ill-will existed between Calabrese and Iodice. Iodice and Valentine witnessed Calabrese's assault upon Albert Rabinow. They testified for the prosecution at the trial which resulted in Calabrese's conviction and subsequent imprisonment. Calabrese had bitter feelings toward Iodice and Valentine because they testified against him. In fact, Calabrese maintained that Iodice and Valentine gave false testimony at his trial, and, if so, then his sense of being aggrieved by their testimony must have been all the greater. Whatever the truth is as to the assault charge, Calabrese's animus is clear. This is evidenced by his own statement made in direct examination during the trial in this case, referring to Iodice and Valentine, ". . . because what they done to me I will never forget as long as I live." (Transcript, p. 1346) [10]

As Secretary-Treasurer of Local 456, Calabrese was ideally situated to strike back at Iodice. In fact, that this is what he did is indicated by various of his own statements as testified to by several witnesses. For example, Raymond Cordaro, an owner of drive-in hamburger stands and a friend of Iodice testified that in 1967 when he was building a new stand Calabrese told him at the job site that if he used non-union help, specifically Iodice, he would never open up. Also, during the same period at the same job site Calabrese told Cordaro, referring to Iodice, that "If that guy doesn't watch his step, one of these days he is going to go down in flames." The reference here was to an airplane which Iodice and Cordaro owned jointly. Ruggiero testified that at one of his meetings with Calabrese after the strike against Pelham had begun, Calabrese said, in substance, that if Ruggiero threw Iodice out of his garage, if he got rid of him, then, he, Ruggiero, would have no problems with the union in the future. Finally, Tramonti testified that after the strike against Pelham had begun Calabrese said to him that Iodice was no good and that he was going to put Iodice out of business.[11]

---

9a. It is claimed to be "somewhat analogous" to this case.

10. It should be noted that there was much testimony in this case concerning the events surrounding Calabrese's trial for assault. More particularly, Iodice and Valentine testified about an attempt made by Calabrese's wife, friends and attorney *before* the trial to persuade Iodice and Valentine to change their testimony in Calabrese's favor. In response the defendants placed on the stand various witnesses who denied that any such attempt occurred. Some of these witnesses testified instead that *after* the trial Iodice and Valentine admitted to Mrs. Calabrese that they had lied. Also, Iodice testified that just before entering the courtroom where Calabrese was to be tried, Calabrese told him "I will get you if it is the last thing I do." (Transcript, p. 491). Calabrese denied making the statement. Resolution of the unhappy factual questions raised here is not required for purposes of this opinion. Suffice it to say, whatever happened, Calabrese's ill feeling towards Iodice cannot be gainsaid.

11. Calabrese denied making these statements, but considering his admitted feelings towards Iodice, the record as a whole,

■ This court finds that an object of the fines imposed on Iodice's customers and of the threats of future labor trouble made against them if they used Iodice was to force these contractors to cease doing business with Iodice.

Defendants make two additional arguments in connection with the plaintiffs' claim that an unfair labor practice has been committed. First, defendants contend that in fact Pelham and Iodice were part of the same business operation. Second, and this really is just a variation of the first argument, defendants contend that Pelham and Iodice were allied employers within the meaning of the famous case of Douds v. Metropolitan Federation of Architects, Engineers, Chemists & Technicians, Local 231, 75 F.Supp. 672 (S.D.N.Y.1948). Both arguments find little support in the record. To be sure, Iodice and Ruggiero have a long-standing personal association. Iodice brought Pelham to Ruggiero's attention, helped him to acquire and staff it, and advised Pelham in its operations. The fact is, though, that Iodice never gave up his own business (at this time Thornwood) to join Pelham. Furthermore, while the evidence assuredly shows that Iodice drove a low-bed trailer-tractor after the commencement of the strike against Pelham, it does not show that Iodice was performing work that Pelham's employees, but for the strike, otherwise would have performed.

■ Moreover, the thrust of these two arguments is that since Iodice and Pelham were identical and since the union was on strike against Pelham, it could take action directly against Iodice. These arguments, therefore, even if sustained by the record, sorely miss the mark. One can assume that the union justifiably and lawfully could have engaged in primary activity against Iodice, but this assumption still provides no predicate whatever for justifying the secondary actions—the fines and the threats—taken against Iodice's customers, independent contractors. These actions were violative of section 158(b) (4) (ii) (B) as already explained. Defendants cannot avoid this conclusion by claiming that they had a basis for primary action against Iodice.

One might remark as an aside here that these arguments by defendants only serve to bolster the conclusion that in fact the union had a dispute with Iodice and that the coercive and threatening actions taken against his customers were taken with the object of forcing his customers to cease dealing with him.

■ In sum, by fining contractors who hired Iodice and by threatening these contractors with labor troubles, and by doing so with the object in view of forcing these contractors to cease doing business with Iodice, defendants committed an unfair labor practice in violation of 29 U.S.C. § 158(b) (4) (ii) (B) (1964).

Moving on now to another subject area, plaintiffs claim that defendants have violated the New York common law against tortious interference with contractual relations and that under New York law they are entitled to recover both compensatory and punitive damages for this wrongdoing. Plaintiffs' claim is based on the same conduct upon which their unfair labor practice claim is based. However, discussion of this common law cause of action is unnecessary inasmuch as a separate recovery based on this theory cannot be allowed because of federal law which preempts this area. Two Supreme Court decisions illustrate this point.

Local 20, Teamsters, Chauffeurs & Helpers Union v. Morton, 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964), involved a strike by the Teamsters against Morton, a subcontractor who provided dump trucks and drivers for highway construction projects. The Teamsters struck Morton after negotiations over a contract with him reached an impasse. Morton brought suit in federal

and the demeanor of these witnesses, the court finds that the testimony summarized in the text is credible and the court accepts it.

court alleging that during the strike the Teamsters had engaged in secondary activities in violation of 29 U.S.C. § 187 and in violation of the common law of Ohio. The district court found that in some instances the Teamsters had violated federal law and it awarded Morton compensatory damages for these violations. The district court also found that in another instance, while the Teamsters had not violated federal law by persuading without use of coercion one of Morton's customers to cease doing business with him, the Teamsters had violated Ohio law. Morton was awarded compensatory damages for this violation of Ohio law, and, in addition, he was awarded punitive damages although the district court found that the picketing employed by the Teamsters had not been accompanied by violence.

The Supreme Court affirmed the award of compensatory damages for the violations of federal law, but it reversed the remainder of the judgment. The Supreme Court reasoned that Congress carefully has considered the problems involved in labor-management relations and has arrived at a balance between the competing interests in this field by defining the permissible bounds of behavior of each side. State law must give way in light of this. To allow the damage award based on Ohio law to stand would be to permit Ohio to proscribe conduct which Congress determined permissible. Similarly, to allow the award of punitive damages to remain would create a conflict with the congressional judgment that only actual, compensatory damages are recoverable for injuries sustained due to unlawful secondary activities. The Supreme Court noted that state law only can be invoked in this area when the injuries sustained resulted from violent conduct. This is because the compelling state interest in maintaining domestic peace cannot be overridden in the absence of a clear congressional direction to that effect.

In United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), members of a local of the United Mine Workers prevented the opening of a coal mine and engaged in violence during the first two days of their action. Gibbs previously had been hired to act as superintendent of the mine and had been given a separate contract to haul the mine's coal. He lost his job and never performed the hauling contract because of the strike. Gibbs sued in federal court alleging violations of federal labor law and a violation of the Tennessee common law against conspiring to interfere with contracts. On post-trial motions the district court considered all of the claims made by Gibbs and awarded him compensatory damages for his state cause of action for interference with his hauling contract. The district court also awarded Gibbs punitive damages.

The Supreme Court reversed the judgment. Citing the *Morton* case the Supreme Court reiterated that where claims of unlawful secondary activities by unions are made, state law only can be applied where the damages alleged were the result of violent conduct. Violent conduct assuredly had occurred in this case but the lower court's judgment was reversed because Gibbs had not clearly proved that the international union, the only defendant in the case, had been involved in the violence. Also, the district court had erred in failing properly to focus the jury's attention on violence as the required predicate of any recovery it might award.[12]

In the case at bar defendants employed coercive tactics of a most outrageous sort, but there is no evidence

12. Two other Supreme Court decisions relevant to federal pre-emption in this area are San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), and Local 24, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers v. Oliver, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959).

that violence ever was involved. Hence plaintiffs' claim of tortious interference cannot afford them a separate basis for recovery allowing an award of punitive damages.

It will be recalled that the second cause of action enumerated in the original complaint alleges violation of the New York common law against secondary picketing and boycotting. This claim too is based on the same conduct involved in the federal claim. Plaintiffs have not discussed this cause of action in their brief or at oral argument, nor have they withdrawn it. In any event, the Supreme Court decisions just described apply equally here, and this cause of action, too, cannot afford plaintiffs a separate basis for recovery.

The next claim asserted is that the union breached its labor contract with Pelham by striking that company. This claim must be considered under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1964),[13] and once again it is federal law which must be applied in light of our national labor policy. *E. g.*, Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962); Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957).

The contract between Pelham and the union is completely silent as to how disputes arising under it were to have been settled. The contract does not create grievance procedures, nor does it provide for arbitration, nor does it obligate the union not to strike during its term. In these circumstances the fact of a strike during the term of the contract, without more, does not automatically constitute a violation of the contract. *See* Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers v. Lu-

cas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593, n. 14 (1962).

Certainly, however, this does not mean that the union would have been justified in striking over unimportant matters. Stripped of all but the essentials, a collective bargaining agreement represents a purchase by an employer of labor for his business, and the basic promise made by a union in every such agreement is that it will provide the employer with men to work. Any action by the union in derogation of this promise can only be justified by a breach by the employer of a significant obligation on his part.

Such a breach occurred here. The record is clear that for several months Pelham failed to make the payments required of it by the contract to the welfare, pension and severance funds established for the benefit of its employees. Welfare, pension and severance payments, in a sense another form of compensation, may occupy a rank equal in importance to that of monetary wages, in the minds of employees. *See* Lewis v. Benedict Coal Corp., 361 U.S. 459, 469, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960). Failure to make these payments was a material breach of the contract on Pelham's part and the union reasonably could have sought to protect its interests in this regard. *cf.*, Sheet Metal Workers Association, Local 270 and General Sheet Metal Co., 144 N.L.R.B. 69 (1963).

Plaintiffs counter, though, by saying that the union could not have acted before giving Pelham reasonable notice of its delinquency. This, it is alleged, the union failed to do. There is in the record testimony by Calabrese that before the strike he called Pelham several times insisting upon payment. Whether Calabrese can be believed in this re-

---

13. No contention has been made that Pelham, a company which had a certificate of public convenience and necessity issued by the Interstate Commerce Commission and which sent its truck across state lines, was not in an industry affecting interstate commerce.

gard or not,[14] the contract itself does not require that any notice be given. Also, the only notice requirement in the Labor-Management Relations Act concerning strikes, section 8(d) 29 U.S.C. § 158(d) (1964), applies only when the union seeks to terminate or modify its contract. *See*, Lion Oil Company and Oil Workers International Union, 109 N.L.R.B. 106 (1954). The union was not required to give notice before striking.

At least initially, then, the union's strike action against Pelham was not a violation of the contract. However, was the union justified in continuing its strike for approximately two years during which Pelham was forced to cease all operations, sell its equipment, and witness the revocation of the certificate of public convenience and necessity issued to it by the Interstate Commerce Commission?

Ruggiero mailed to the union five checks dated December 17, 1965, as payment of the various claims made by the union against Pelham. These checks were rejected by Calabrese and returned to Ruggiero on December 20, 1965. At this time, in addition to the welfare, pension and severance payments, Calabrese claimed that Pelham owed Tramonti his full weekly salary for each week of the strike, $1323, because he claimed, during the strike Iodice had been driving Pelham's equipment and doing the work that rightfully belonged to Tramonti. From then on Calabrese always insisted upon payment of Tramonti's salary as a condition of ending the strike, and as the weeks went by the amount demanded increased.

It already has been stated that while the evidence shows that Iodice was driving a tractor-trailer during the strike, it does not show that Iodice drove anything but his own equipment. And so the question is whether the union's unjustified insistence upon payment of moneys

not due as a condition of settling the strike rendered the union in violation of its contract with Pelham.

Neither party has cited any authority directly on point, nor has the court's independent research uncovered any. However, guidance is not completely lacking. The issue presented must be viewed in light of our national labor policy and the special role played by collective bargaining agreements in that policy.

 Simply stated, our national labor policy holds that industrial peace and stability is the desideratum and collective bargaining agreements are a primary means of achieving it. These agreements are supposed to create the framework within which labor and management are to function together. Indeed, employers and unions have an explicit statutory obligation to meet and bargain with one another in good faith ". . . with respect to . . . [*inter alia*] the negotiation of an agreement, or any question arising thereunder. . . ." 29 U.S.C. § 158(d) (1964). More so than other forms of agreements collective bargaining agreements contemplate a continuing relationship between the parties, resolution of disputes being the goal rather than tolerance of disharmony and vindictiveness resulting in the idling both of businesses and employees. *See*, United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

 There is no place in this scheme for strikes which serve no legitimate labor purpose. Yet that is the kind of strike that was waged by the union once Pelham admitted its delinquency and offered to pay all that it owed under the terms of its contract. At that point continuance of the strike could not be justified. The initial violation by Pelham and the claim as to Tramonti's wages became a pretext for

---

14. Calabrese testified that before the strike he called Pelham at least a half dozen times about its delinquency, speaking when he called to Iodice or whoever answered the telephone. There was no direct contradiction of this testimony although Ruggiero testified that before the strike he never received a complaint from the union about Pelham's failure to make the required payments.

the purpose of punishing Pelham; for the purpose of exacting from it a substantially larger sum of money than it rightfully owed; for the purpose of demonstrating the power of this union over those with whom it did business. Such a strike must be condemned as being in violation of the union's collective bargaining agreement with Pelham. Compare, Grassi Contracting Co., Inc. v. Bennett, 174 App.Div. 244, 160 N.Y.S. 279 (1st Dept. 1916). (The employer's men inadvertently violated union work rules as to working hours and the union decreed in response that for one year thereafter the employer's jobs would be placed in the hands of a union-designated foreman, the result being substantially increased labor costs. The court held that a strike threatened to enforce this penalty would be unlawful.) Bridge Hardware Co., Inc. v. Horowitz, 22 Misc. 2d 914, 93 N.Y.S.2d 323 (Sup.Ct.1949) (A strike to enforce a demand that union officers be paid $3000 as the price of labor peace was held unlawful.) [15]

Local 456 breached its contract with Pelham by continuing its strike beyond December 20, 1965, the day when Calabrese rejected Pelham's tendered payment and insisted upon payment of Tramonti's salary as a condition of ending the strike.

Plaintiffs also seek to impute antitrust violations to the defendants. It is alleged that various activities of the defendants violate Section 1 of the Sherman Anti-trust Act.[16] It is further alleged that none of these activities is protected by the Clayton Act [17] or the

---

15. In connection with their breach of contract claim, plaintiffs argue based on New York law that defendants committed a *prima facie* tort in calling the strike against Pelham.

When compatible with the purposes of federal labor law, state law may be looked to for guidance in fashioning the rules to be applied in the federal sphere. Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 457, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957). *Prima facie* tort theory certainly could play a salutary role in federal labor law in cases where a union and its officials abuse their positions of trust and responsibility. Therefore, this court would invoke *prima facie* tort doctrine as a basis for recovery where appropriate.

Here, however, while the court has no hesitation in finding that Calabrese's animus towards Iodice also was directed at Iodice's friend, Ruggiero, and that Calabrese's actions towards Pelham were motivated by malice, the court cannot find that the strike against Pelham was conducted solely for the purpose of injuring it. Hence plaintiffs have not made out a case of *prima facie* tort under New York law. E. g., Reinforce, Inc. v. Birney, 308 N.Y. 164, 124 N.E.2d 104 (1954); Schisgall v. Fairchild Publications, Inc., 207 Misc. 224, 137 N.Y.S.2d 312 (Sup.Ct. 1955).

16. Section 1 of the Sherman Antitrust Act, 26 Stat. 209 (1890) 15 U.S.C. § 1 (1964) provides in part:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal . . . ."

17. Section 6 of the Clayton Act, 38 Stat. 730 (1914), 15 U.S.C. § 17 (1959) provides:

"The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor * * * organizations, instituted for the purposes of mutual help * * * or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws."

Section 20 of the Clayton Act, 38 Stat. 738 (1914), 29 U.S.C. § 52 (1959) provides:

"No restraining order or injunction shall be granted by any court of the United States, or a judge or the judges thereof, in any case between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property, or to a property right, of the party making the application, for which injury there is no adequate remedy at law * * * And no such restraining order or injunction shall prohibit any person or persons [from striking, assembling, organizing, etc.] * * * *"

Norris-LaGuardia Act.[18] The claim is that the defendants have violated the antitrust laws by (1) pursuing a unilateral method of contract negotiations with non-association employers, (2) by imposing fines not provided for contractually, on employers who hire non-union labor, and (3) by the practice of "featherbedding." These claims have not been established.

■ It is settled that labor unions are not exempt from the provisions of the Sherman Antitrust Act in some circumstances. For example, Allen Bradley Co. v. Local Union No. 3, International Brotherhood of Electrical Workers, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), held a union liable for Sherman Antitrust Act violations when it was found that the labor union combined and conspired with business groups to restrain competition. On the other hand, Hunt v. Crumboch, 325 U.S. 821, 65 S.Ct. 1545, 89 L.Ed. 1954 (1945), decided on the same day as Allen Bradley, supra, found no Sherman Antitrust Act violation against the union because there no combination or conspiracy to achieve a restraint of trade between business groups and labor unions was found to exist.

In the case at bar plaintiffs contend that the union has combined or conspired with non-labor groups to engage in practices that are allegedly anticompetitive and in restraint of trade. There is no support for such a finding.

The plaintiffs claim that the defendants have violated antitrust laws by pursuing a unilateral method of contract negotiations with non-association contractors.

■ The union negotiates its contract with an association of contractors in Westchester County. These contracts then are offered to contractors who want to sign with the union, whether or not they belong to this association. No contractor ever has negotiated with the union a contract that differs in any respect from the one that is agreed to and accepted by this association. The union has no agreement with this association, however, that requires it to follow this practice of offering the same contract to the contractors who sign with it. Hence plaintiffs' claim that defendants' practice violates the antitrust laws must fail. See, United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed. 2d 626 (1965).

In Pennington the claim was that the U.M.W. had entered into a conspiracy with the large [coal mine] operators to impose the wage and royalty scale agreed upon by the large coal mine operators and the union on the smaller, non-union operators, regardless of the latter's ability to pay. This was done for the purpose of eliminating the non-union operators from the industry, thereby limiting production and preempting the market for the large, unionized operators. 381 U.S. 664. It was stated in Pennington that an agreement resulting from union-employer negotiations is not automatically exempt "from Sherman Act scrutiny simply because the negotiations involve a compulsory subject of bargaining. . . ." Pennington at p.

18. (a) Section 4 of the Norris-LaGuardia Act, 47 Stat. 70 (1932), 29 U.S.C. § 104 (1959), provides:
"No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons * * * from doing, whether singly or in concert, any of the following acts: [striking, joining a labor union, giving strike benefits, lawfully aiding in a labor dispute, publicizing a dispute, assembling, etc.]"

(b) Norris-LaGuardia Act § 13(c), 47 Stat. 73 (1932) 29 U.S.C. § 113(c) (1959) provides:
"The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

664, 85 S.Ct. at p. 1590. However, it was further stated in *Pennington* that a union may make wage agreements with a multi-employer bargaining unit and may in pursuance of its own union interests seek to obtain the same terms from other employers. No case under the antitrust laws can be made out on evidence limited to such behavior. The Court stated, "Unilaterally, and without agreement with any employer group to do so, a union may adopt a uniform wage policy and seek vigorously to implement it even though it may suspect that some employers cannot effectively compete if they are required to pay the wage scale demanded by the union . . . Such union conduct is not alone sufficient evidence to maintain a union-employer conspiracy charge under the Sherman Act. There must be additional . . . evidence of the conspiracy." *Pennington* at p. 665, fn. 2, 85 S.Ct. at p. 1591.

 *Pennington* teaches that a union forfeits its exemption from the antitrust laws when it is shown that it has agreed with one set of employers to impose a certain wage scale on other bargaining units. To be exempt from the antitrust laws a union must be acting alone, in its self-interest and in pursuit of its own objectives.

 In the case now before the court, the union's conduct in connection with its contract negotiations with non-association employers was unilateral rather than in combination with employers who were association members. The plaintiffs have not shown that the union and non-union groups have combined or conspired to eliminate competition or achieve any other anti-competitive restraint of trade.

Another antitrust violation alleged is that a restraint of trade resulted because non-labor groups acquiesced in the fining of contractors despite the fact that the union contract did not call for fines.

 Plaintiff has failed to establish by a preponderance of the evidence [19] that the imposition of fines and the apparent acquiescence thereto was part of a combination or conspiracy to restrain trade. All the record shows is that the members of the negotiating committee of the contractors association were familiar with the union's practice of imposing fines and that no objections were raised to the practice. The fines complained of were imposed by the union unilaterally. There is no proof of any combination or conspiracy. Plaintiffs presumably would have this court infer from the apparent failure of other contractors to object to the union's fines an agreement by those contractors with the union that the fines could be imposed. However, the failure of the contractors to make any objection is more readily explainable by the threat behind the union's fines rather than by any agreement on the contractor's part. In any event, to prove a conspiracy the plaintiffs must show that the union and the contractors in some way reached an understanding and joined together in a common purpose. Plaintiffs have failed to adduce any such proof.

 Finally, plaintiffs allege that the union violates the antitrust laws by featherbedding. They point first to the union's requirement that there be two men on a fuel delivery truck making deliveries to construction sites, and, second, to the union's practices regarding shop stewards. Standing alone, featherbedding does not violate section 1 of the Sherman Antitrust Act. United States v. Carrozzo, 37 F.Supp. 191 (N.D.Ill. 1941), aff'd per curiam sub nom. United States v. International Hod Carriers, 313 U.S. 539, 61 S.Ct. 839, 85 L.Ed. 1508

19. A preponderance of the evidence is the standard of proof to be applied in Sherman Act suits against labor unions. Ramsey v. United Mine Workers of America, 401 U.S. 302, 91 S.Ct. 658, 28 L.Ed. 2d 64 (1971). The "clear and convincing proof" required by section 6 of the Norris-LaGuardia Act relates only to a union's ratification or authorization of the alleged unlawful conduct performed on its behalf. The Court stated that section 6 is not addressed to the quantum of evidence required to prove the occurrence of the alleged "unlawful acts."

(1941); *compare* National Woodwork Mfg. Assoc. v. N. L. R. B., 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1966); Local Union No. 189 Amalgamated Meat Cutters & Butcher Workmen v. Jewel Tea Co. Inc., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965); Intercontinental Container & Transportation Corp. v. New York Shipping Assoc., 426 F.2d 884, 889 (2d Cir. 1970).

Before proceeding to a consideration of the remedies to which the plaintiffs are entitled, attention must be given to Valentine's case. Valentine joined with Iodice in testifying against Calabrese at the latter's trial for assault. Calabrese's strong feelings of ill will extended to both men. Valentine testified here that over the years he lost business due to pressure by the union. However, this general testimony is unsupported by any details, and thus there is nothing in the record upon which the court can base a finding that any losses suffered by Valentine were due to unlawful activities by the defendants. Hence Valentine has failed to prove his claims and his case must be dismisssed.

The court has found that Iodice and Thornwood have been the victims of unfair labor practices engaged in by the defendants. These plaintiffs ask that an injunction be issued on their behalf enjoining the defendants from engaging in this activity in the future. The court is without power to grant this request. Section 303 of the Labor Management Relations Act, 29 U.S.C. § 187 (1964), under which this portion of the law suit was brought, authorizes suits for damages only. It does not authorize a suit for injunctive relief. Table Talk Pies v. Strauss, 237 F.Supp. 514, 519 n. (S.D. N.Y.1964); Haspel v. Bonnaz, Singer & Hand Embroiderers, Tuckers, Stitchers & Pleaters Local 66, 112 F.Supp. 944 (S.D.N.Y.1953), aff'd per curiam, 216 F.2d 192 (2d Cir. 1954).

Iodice and Thornwood also seek a recovery for damages suffered by them as a result of the unfair labor practices committed by defendants. In this connection it is important to pause and take note that both Calabrese and Local 456 are named as defendants in the two causes of action sustained by the proof, that is, the unfair labor practice cause of action and the breach of contract cause of action. However, while the union is bound by and therefore is liable for the acts of Calabrese, its Secretary-Treasurer and Agent, 29 U.S.C. § 185(b) and (e) (1964). Calabrese himself is not subject to any money judgment rendered in plaintiffs' favor under either cause of action upon which they have prevailed. Atkinson v. Sinclair Refining Co., 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962); Edmund E. Garrison, Inc. v. International Union of Operating Engineers, Locals 137, 137A, 137B, 283 F. Supp. 771 (S.D.N.Y.1968).

Lastly we turn to the issue of monetary damages. Federal law controls here. Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 923, 1 L.Ed. 2d 972 (1957). The parties have stipulated that plaintiffs may recover damages only for the period subsequent to February 11, 1963. (Transcript p. 14)

Iodice and Thornwood have suffered unfair labor practices committed against them by Local 456 in violation of 29 U.S.C. § 187(b) (1964). As recompense they may recover only the actual pecuniary losses caused them by the union's unlawful secondary activity, Sheet Metal Workers Int'l. Assn. Local 223 v. Atlas Sheet Metal Co., 384 F.2d 101, 109 (5th Cir. 1967); section 187(b) does not authorize an award of punitive damages. Local 20, Teamsters, Chauffeurs & Helpers Union v. Morton, 377 U.S. 252, 260–261, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964).

Plaintiffs have the burden of proving their damages by a fair preponderance of the credible evidence. While plaintiffs need not establish their damages with exactitude, Gulf Coast Bldg. & S. Co. v. International Brotherhood of Electrical Workers, 428 F.2d 121, 125

(5th Cir. 1970), their burden cannot be sustained by indulgence in "sheer speculation" or "guesswork." United Mine Workers v. Osborne Min. Co., 279 F.2d 716, 727 (6th Cir. 1960), citing Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931). An excessive award is subject to reversal. Plumbers & Steamfitters Union Local 598 v. W. C. Dillion, 255 F.2d 820, 824 (9th Cir. 1958).

For the most part Iodice and Thornwood have failed completely to present this court with a record upon which a supportable award in their favor might be rendered. In the main they have attempted to establish that their businesses suffered a diminution in gross profits due to the union's unlawful conduct. *See,* International Union of Operating Engineers, Local 653 v. Bay City Erection Co., 300 F.2d 270, 273 (5th Cir. 1962). This, they contend, is demonstrated by a comparison of the gross profits [20] of their business operations with those earned by Pleasant Excavators and Equipment Rental Company, Inc. established in 1969. Iodice was employed by it at the time of trial. Pleasant Excavators has operated relatively free of union difficulties. Leaving aside whether this comparison is legally valid for purposes of awarding damages here, the proof of Iodice's and Thornwood's gross profits is so speculative and unsupported as to require rejection.

The proof of Iodice's and Thornwood's gross profits rested on two forms of evidence: various exhibits allegedly indicative of the business performed by Iodice and Thornwood during the relevant period, and the testimony of Iodice himself based on his own personal rec-

ollections of the business performed and upon his claimed expertise as to the costs involved in his type of business. Neither form of evidence offered withstands examination.

The documentary evidence offered by plaintiffs consists of slips of paper which only generally refer to moving jobs allegedly performed by Iodice or Thornwood. These slips neither are invoices nor formal internal accounting records. It was admitted that the significance of the information on many of the slips is unclear and even duplicative in some instances. Elements of cost are not indicated. These slips cannot be used to determine Iodice's or Thornwood's gross profits.

None of the plaintiffs offered their books and records. There was testimony that during the weekend after the start of the trial the office shared by Iodice, Thornwood, and Pelham, at 10 Walnut Place, Thornwood, New York, was burglarized and that all of the books and records were stolen. Further supportive documentation, it was claimed therefore could not be produced. Some issue was made by the defendants as to the veracity of this burglary claim. Assuming, however, that the burglary occurred, plaintiffs certainly did not avail themselves of all of the alternative modes of proof open to them. For example, it was testified that tax returns were filed by the plaintiffs. Yet copies of these returns were not produced, nor was any indication given by counsel that additional time was required to obtain such copies. Former bookkeepers were not called, nor, with one exception, was their unavailability accounted for. All of this is not meant to suggest that plaintiffs were required to adduce any particular

---

20. The court's use of the term "gross profits" is predicated solely upon its employment by the parties at trial and in their post trial papers. Its use in this text is not in recognition of its legal significance or an acknowledgment of its established place in accounting lexicon, but merely for purposes of consistency.

In this action the term "gross profits" has been used to refer to the difference between revenue received from services rendered (i. e. "business done") and the costs involved in providing that service. Succinctly stated, as used herein "gross profit" equals revenue minus costs.

item of evidence. It was entirely within their province to determine how to proceed with their case. It is intended only to note the inadequacies of the approach followed.

In the main the testimony relied upon to prove damages was Iodice's. This too fell short.

 That Iodice's testimony was self-serving is an obvious point that must be kept in mind. The interest of a witness is an important element in determining his credibility and reliability. To be sure, testimony is not to be rejected automatically and solely on the grounds of interest. Here, though, Iodice's testimony founders on too many other shoals to permit the self-interest factor to be considered lightly.

Iodice was asked to give testimony concerning his gross profits and Thornwood's during the years in question. In response he offered only imprecise figures based purely on his own admittedly indefinite recollection. Iodice need not have been as uncertain as he was.[21] The books and records assertedly were stolen, but the alleged burglary did not take place until just a few days before Iodice was called to testify. Iodice knew that he was scheduled to take the stand soon; his attorney had asked him to prepare for that event. Yet, though he said he did go over some of his testimony in his mind, he also testified, that he intentionally did not review the books and records although they were readily available to him in his office. Iodice conceded that the books and records would have provided more accurate information than his unaided recollection, but, incredulously, he explained that he did not look at the books and records because he wanted to see how good his recollection was. Therefore, he testified, he did not bother to consult the books and records. In his words he did not deem verification of his recollection in this matter "important"—even though he knew he was going to be examined shortly about matters recorded therein.

On the other hand Iodice also testified to the costs of doing business as a mover of heavy construction equipment. In addition to his recollection Iodice relied on his alleged expertise here. For a given amount of business in terms of dollars, Iodice estimated the amount of costs involved. Again, however, he seemed to approach so important an inquiry in an incredibly offhand manner. He admitted making his calculations only on the witness stand. On cross-examination Iodice was asked how he derived these costs. He answered by stating that he had asked his attorney what elements of costs "should" be included in making his calculations. (Transcript p. 728)

 Iodice's self-serving testimony is so completely unsupported, unrelia-

---

21. Excerpts from cross-examination of Anthony Iodice, pp. 580–581:

Q. So you were in the office of your company getting ready to testify at this trial concerning the business transactions of at least one of the plaintiffs involved here, Thornwood, is that correct?
A. Yes.
Q. And any entries that you made you did solely from your recollection:
A. Yes.
Q. And you had no reference to any of the books or the records of that corporation?
A. No, sir.
Q. Where were they at that time?
A. Locked up in the cabinet or in a cabinet. I don't know if the cabinet was locked or not.

Q. Well, did you see them?
A. No, sir.
Q. When did you last see them prior to last Saturday?
A. Approximately a month ago or so.
Q. Do you know if they were there last Saturday?
A. Yes.
Q. Did you see them?
A. Not physically, no.
Q. How do you know they were there if you didn't see them?
A. Mrs. Laverty wanted to take them out of the cabinet if it would help me doing this work, and I told her no. She had opened the drawer and started to take them out. I said "No, I don't want them. I want to see if I can remember everything myself."

ble [22] and frivolous as to preclude a finding of actual loss, except upon the sheerest speculation. *See* Riverside Coal v. United Mine Workers of America, 410 F.2d 267, 274 (6th Cir. 1969). Yet it can be said that defendants' tortuous and illegal conduct caused plaintiff a legal wrong. In such a case section 187 (b) of Title 29 permits an award of nominal damages. *See* Hyatt Chalet Motels, Inc. v. Salem Bldg. & Const. Tr. Council, 298 F.Supp. 699, 706 (D.Oregon, 1968). Accordingly, Iodice is awarded the sum of One Hundred Dollars, ($100.00).

Thornwood Excavators, Inc., which was in operation between 1965 and 1968 did prove that it sustained actual financial loss due to the defendants' coercive and unlawful conduct. Customers of Thornwood testified as to the dollar amount of business which they were coerced to withhold from Thornwood by the defendants during these years. (Transcript pp. 51, 66, 102, 166, 184)

 Thornwood is entitled to Five Thousand Dollars ($5,000.00) which is the total loss of profit occasioned by the loss of business from these customers during the relevant period.

There remains Pelham's and Ruggiero's claims for damages based upon Local 456's breach of its contract with Pelham.

 Since Ruggiero was not a party to the contract between Pelham and the union, his claim for damages for breach of that contract is dismissed.

Pelham's claim relies in part on slips of paper which are generally of the same poor quality as those relied upon by Iodice and Thornwood. These slips of paper provide no consequential information on the issue of damages. They have no probative value whatsoever.

 Iodice's testimony on behalf of Pelham, with which he was closely identified, suffered from all of the infirmities that infected his testimony on his own behalf. His figures, at the very best, can be described as desultory. His calculations were made as he went along, without the benefit of any of the books and records, which, by his own admission, were still available. Clearly, Pelham's claim for lost profit must be denied for lack of proof. Lost profits are recoverable only when they can be proved with reasonable certainty. *See* Blue Diamond Coal Co. v. United Mine Workers of America, 436 F.2d 551, 561 (6th Cir. 1970); Textile Workers v. Newberry Mills, Inc., 51 Labor Cases 19, 669, aff'd 315 F.2d 217 (4th Cir.) cert. denied 375 U.S. 818, 84 S.Ct. 54, 11 L.Ed.2d 53 (1963). Pelham has proved that defendants' breach of contract caused it to cease doing business and to liquidate its assets. As a result of this breach, Pelham was forced to sell its second-hand tractor and low bed trailer, purchased by it for $23,000 in April 1965 for $8,100 in November 1966. A loss of this type

---

22. Excerpts of cross-examination of Iodice, pp. 713–14:

Q. When you testified "We looked through everything", was that true?

A. A figure of speech, I said, "we."

Q. No. Was it true, not a figure of speech? Mr. Iodice?

A. No, it wasn't true.

&ast; &ast; &ast; &ast; &ast;

P. 719:

Q. Now, you were never in the office on Sunday while your secretary was there, were you?

A. No, I wasn't.

Q. But you testified in answer to Mr. Greenspan's question that you were?

A. No, I waited for her and she didn't come around 3 o'clock.

Q. Did you testify in answer to his question that you were with your secretary in your office on Sunday?

A. Yes, I believe so.

Q. Are you uncertain as to that testimony?

A. No, I am not uncertain. I did.

&ast; &ast; &ast; &ast; &ast;

Page 721:

Q. And when you said that while you were at the office on Sunday you found out what papers were missing while your secretary was there, that was not true either?

A. That's correct.

Q. That's not true?

A. Yes, it's not true.

&ast; &ast; &ast; &ast; &ast;

is compensable under § 301(a) of Title 29, U.S.C.; Plumbers & Steamfitters Union Local No. 598 v. Dillion, 255 F.2d 820, 823–824 (9th Cir. 1958). Accordingly, Pelham is awarded $14,900 in reparation for this loss.

In sum, the court concludes as follows:

Plaintiffs' first claim, based upon section 340 New York General Business Law, was withdrawn at the time of closing argument.

Plaintiffs' second claim, based upon the New York common law of secondary picketing and boycotts is dismissed by virtue of the doctrine of congressional preemption over state law.

With respect to the third claim, Local 456 has committed unfair labor practices against plaintiffs Iodice and Thornwood. Iodice is entitled to recover from the union $100 as nominal damages for this violation. Thornwood is entitled to recover from Local 456 compensatory damages in the amount of $5,000, representing lost profits occasioned by the union's conduct.

Under the fourth claim, predicated upon Section 301 of Title 29, U.S.C., Pelham Transportation has proved that Local 456 breached its collective bargaining agreement with it by continuing to strike past December 20, 1965. Pelham is awarded $14,900 in contract damages as recompense for the union's breach.

Plaintiffs' fifth claim against defendant Calabrese for breach of fiduciary obligations, predicated on New York labor law, was withdrawn at the time of closing argument.

Plaintiffs' claim for tortious contract interference under New York common law is dismissed by virtue of congressional preemption over state law.

Lastly, plaintiffs' claim based upon various alleged violations of antitrust law is dismissed for lack of proof.

So ordered.