512 F.2d 383
 88 L.R.R.M. (BNA) 3042, 76 Lab.Cas. P 10,715
 Anthony IODICE et al., Plaintiffs-Appellees-Appellants,
v.
Adele CALABRESE and Teamsters and Chauffers Local 456,
International Brotherhood of Teamsters,
Defendants-Appellants-Appellees.
 Nos. 73, 109, Dockets 73-2470, 74-1884.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 20, 1974.
Decided Feb. 25, 1975.
 
 Leon J. Greenspan, White Plains, N. Y. (Greenspan & Aurnou, White Plains, N. Y., on the brief), for plaintiffs-appellees-appellants.
 John J. Sheehan, New York City, for defendants-appellants-appellees.
 Before SMITH, HAYS and MANSFIELD, Circuit Judges.
 HAYS, Circuit Judge:
 
 
 1
 Plaintiffs filed suit in New York Supreme Court alleging that defendants Peter Calabrese and Teamsters and Chauffeurs Local 456 of the International Brotherhood of Teamsters had violated § 303 of the Labor Management Relations Act, 29 U.S.C. § 187 (1970), the labor contract between plaintiff Pelham Transportation Co. and Local 456, and various provisions of New York state law.[1] On defendants' motion, the case was removed to the United States District Court for the Southern District of New York. See Iodice v. Calabrese, 291 F.Supp. 592 (S.D.N.Y.1968). After trial, Chief Judge Edelstein, sitting without a jury, held that the defendants had violated § 303 and the labor contract with Pelham. Iodice v. Calabrese, 345 F.Supp. 248 (S.D.N.Y.1972). For the violation of § 303, he granted plaintiff Anthony Iodice nominal damages of $100 and plaintiff Thornwood Excavators and Movers, Inc. damages of $5,000. For violation of the labor contract, he granted Pelham damages of $14,900. The other claims were dismissed.
 
 
 2
 We reverse the decision as to the violation of the labor contract. We affirm the holding as to the § 303 claim but remand to the district court on the issue of damages. In all other respects, we affirm.
 
 I.
 
 3
 For many years, Anthony Iodice has worked in the Westchester County construction industry operating his own trucking equipment. During that time he has had a stormy relationship with Local 456 of the Teamsters and particularly with its secretary-treasurer, Peter Calabrese.[2] At one time Iodice was a member of the Local as an owner-driver, but in 1949 the union decided that owner-drivers should not continue to be allowed to become or remain members of the union. The union offered the owner-drivers an opportunity to sign contracts with the union as owners. Iodice was among many who declined to do so.
 
 
 4
 In October 1951, Iodice testified that while driving for a company against which Local 456 was striking, he had witnessed an assault by Calabrese. Calabrese was convicted and served nine months in prison.
 
 
 5
 Since 1953 Iodice has been in the business of moving heavy construction machinery by use of a low-bed trailer and tractor. He operated under his own name until 1965, when he sold his equipment to Thornwood Excavators and Movers, Inc., which was formed by his sister Elissa Guiliano, and went to work for Thornwood as a manager and driver.
 
 
 6
 The district court found that at various times, both on his own and with Thornwood, Iodice lost business because of pressure put on customers by Local 456 not to deal with him. 345 F.Supp. at 254. The district court enumerated five specific instances in which contractors had hired Iodice to move their equipment but later let him go. 345 F.Supp. at 254-55. In each instance Peter Calabrese threatened the customer with either work stoppage or fines or both if he did not stop dealing with Iodice. In three of the cases, he imposed fines on contractors for having already dealt with Iodice.
 
 
 7
 Early in 1965 Iodice entered into a contract on behalf of his friend Bart Ruggiero to buy Pelham Transportation Co., which held certificates of public convenience and necessity from the Interstate Commerce Commission and the New York State Public Service Commission. Iodice held no formal position with Pelham but he did serve as an informal advisor on such matters as the computation of rates and the selection of routes. Iodice also contacted Local 456 on behalf of Pelham to propose a contract and to request that the union accept Pelham's two drivers, Nicholas Tramonti and Joseph Nicolai, as members. Calabrese agreed and on April 9, 1965, Iodice and Ruggiero came to the union hall where, at Calabrese's insistence, Iodice signed the contract.
 
 
 8
 On November 5, 1965, Local 456 began picketing Pelham's premises. Calabrese told Ruggiero that the reason for the picketing was Pelham's failure to make fringe benefit payments as required by the union contract. On December 17 Ruggiero had checks sent to cover what was owed. Calabrese sent the checks back on December 20 on the grounds that the amounts sent were inadequate and that Pelham also owed Tramonti $1,323 for the seven weeks he had not worked because of the picketing. Calabrese claimed that this money was due to Tramonti because Iodice had driven for Pelham in place of Tramonti in violation of the union contract. The picketing continued for two years, during which time Pelham could not do any work. Eventually, Ruggiero sold its equipment and the ICC revoked its certificate of public convenience.
 
 
 9
 Around the beginning of 1969, Iodice went to work as manager and driver for Pleasant Excavators and Equipment Rental Company, another corporation owned by his sister.
 
 II.
 
 10
 Local 456 argues that the action it took against the contractors who dealt with Iodice was protected primarily actively because it was intended to enforce the work preservation clauses in the union's contract.[3] However, the district judge found that the pressure exerted on contractors dealing with Iodice was intended to force them to cease doing business with Iodice. The court concluded therefore that Local 456 had violated § 8(b()4()B)[4] and consequently § 305[5] of the Labor Management Relations Act, 29 U.S.C. §§ 158(b)(4)(B). 187 (1970), regardless of whether other factors had also led it to take action against Iodice's customers. We agree.[6]
 
 
 11
 Section 8(b)(4)(B) makes it an unfair labor practice for a labor organization to "threaten, coerce or restrain" any person engaged in commerce "where an object thereof" is to force him to cease doing business with any other person. It is well settled that such action is not immunized merely because the union claims to be enforcing the terms of its contract. Landstrom v. Chauffeurs, Teamsters, Warehousemen & Helpers, Local 65, 476 F.2d 1189, 1192-93 (2d Cir. 1973); N. L. R. B. v. Milk Drivers and Dairy Employees Local 584, 341 F.2d 29, 32-33 (2d Cir.), cert. denied, 382 U.S. 816, 86 S.Ct. 39, 15 L.Ed.2d 64 (1965); N. L. R. B. v. International Union of Operating Engineers, Local 12, 293 F.2d 319, 322-23 (9th Cir. 1961). When a labor organization takes action for the purpose of forcing an employer to cease doing business with another, it violates § 8(b)(4)(B) even if it has other purposes as well. N. L. R. B. v. Denver Building and Construction Trades Council, 341 U.S. 675, 689, 71 S.Ct. 943, 95 L.Ed. 1284 (1951); Local 74, United Brotherhood of Carpenters and Joiners v. N. L. R. B., 341 U.S. 707, 713, 71 S.Ct. 966, 95 L.Ed. 1309 (1951); N. L. R. B. v. New York Lithographers & Photo-Engravers Union No. One-P, 385 F.2d 551, 554-56 (3d Cir. 1967).
 
 
 12
 The union argues that under the Supreme Court's decision in National Woodwork Manufacturers Ass'n v. N. L. R. B., 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967), the action which it took allegedly to enforce its work preservation clause[7] should be considered a protected activity under the statute, regardless of the impact on third parties such as Iodice. This argument misconstrues the holding in National Woodwork. In that case, the Court dealt with the refusal by a carpenters' union to hang prefitted doors, use of which was prohibited by its collective bargaining agreement with the contractors. The Court upheld a finding that this action "related solely to preservation of the traditional tasks of the jobsite carpenters," and therefore held it to be protected primary activity. 386 U.S. at 646, 87 S.Ct. at 1269; Id. at 648, 87 S.Ct. 1250 (Memorandum of Harlan, J.); see Houston Insulation Contractors Ass'n v. N. L. R. B., 386 L.Ed.2d 389 (1967). Here, however, the district court found that the union's action against the contractors was intended at least in part as a weapon in its dispute with Iodice. The intention to hurt Iodice by putting pressure on his customers brings the case squarely within the secondary boycott provisions of § 8(b)(4)(B).
 
 III.
 
 13
 The plaintiffs argue that the district court erred in awarding Thornwood only $5,000 and Iodice only nominal damages of $100 for injury suffered as a result of the union's violations of § 303. The district court awarded damages of $5,000 to Thornwood based on the testimony of five customers as to the amount of business they normally did with Thornwood before the union pressured them into dealing elsewhere. 345 F.Supp. at 273. Further damages were denied because the court was dissatisfied with the proof Iodice submitted concerning the profits he earned individually and with Thornwood up to 1969, when his labor problems subsided.[8] 345 F.Supp. at 271-73.
 
 
 14
 In actions under § 303, the courts have held that
 
 
 15
 "(w)hile the employer must prove that he has sustained some injury to his business or property, he need not detail the exact amount of damages suffered. It is sufficient if the evidence supports a just and reasonable approximation." Sheet Metal Workers, Local 223 v. Atlas Sheet Metal Co., 384 F.2d 101, 109 (5th Cir. 1967).
 
 
 16
 See Landstrom v. Chauffeurs, Teamsters, Warehousemen & Helpers, Local 65, 476 F.2d 1189, 1195 (2d Cir. 1973); Mason-Rust v. Laborers' International Union, Local 42, 435 F.2d 939, 945-46 (8th Cir. 1970); Flame Coal Co. v. United Mine Workers, 303 F.2d 39, 44 (6th Cir.), cert. denied, 371 U.S. 891, 83 S.Ct. 186, 9 L.Ed.2d 125 (1962).
 
 
 17
 In light of these principles, we remand to the district court for a reassessment of plaintiffs' damages. The district court obviously found Iodice's testimonial and documentary evidence insufficient to establish precisely how much profit was lost from 1963[9] until 1969. However, the court did find that during that time the union had engaged in a largely successful campaign to keep business away from Iodice. 345 F.Supp. at 254-55. On remand the district court should "make a just and reasonable estimate of the damage (suffered by Iodice and Thornwood) based on relevant data," Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264-65, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946), including the testimony of Iodice and of customers, and evidence of profits realized by Pleasant Excavators after the unfair labor practices had ceased.
 
 IV.
 
 18
 In addition to the actions by Iodice and Thornwood under § 303, Pelham and Bart Ruggiero sued under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1970), for breach of Pelham's labor contract. The district court held that Local 456 had violated the agreement by continuing its strike beyond December 20, when Calabrese rejected Pelham's offer and insisted that Tramonti be paid for the time he had missed. 345 F.Supp. at 267. Accordingly, the court granted Pelham $14,900 in damages. We disagree with the district court's determination that Local 456 was liable under § 301 for breach of contract.
 
 
 19
 The union contract to which Pelham and Local 456 agreed contained neither a no-strike nor an arbitration clause. 345 F.Supp. at 265. In such cases the courts will not imply an absolute contractual bar to strikes during the term of the agreement. See Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers v. Lucas Flour Co., 369 U.S. 95, 105 n. 14, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962).
 
 
 20
 Recognizing this fact, the district court nevertheless held that our "national labor policy" requires that strikes for "no legitimate labor purpose" be forbidden as breaches of contract, even absent no-strike or arbitration clauses. 345 F.Supp. at 266-67. In the view of the district judge, the union's strike was for a "legitimate labor purpose" as long as its demand for fringe benefit payments went unanswered. As soon as the union rejected Pelham's tender of payment as inadequate and added the demand that Tramonti's back wages be paid, the strike became illegitimate.
 
 
 21
 In our view, national labor policy does not permit the courts to outlaw a strike solely on the ground that it appears to be unreasonable. Unless the strike is itself an unfair labor practice under § 8(b) of the Act, see, e. g., United Mine Workers v. Osborne Mining Co., 279 F.2d 716 (6th Cir.), cert. denied, 364 U.S. 881, 81 S.Ct. 169, 5 L.Ed.2d 103 (1960), or is prohibited by a no-strike or arbitration clause in a contract, see, e. g., Boys Markets, Inc. v. Retail Clerk's Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970); Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers v. Lucas Flour Co., supra, it remains a legitimate economic tool which labor organizations may use as they see fit. Cf. § 13 of the Labor Management Relations Act, 29 U.S.C. § 163 (1970). We therefore hold that the continuation of the strike beyond December 20 did not give rise to a cause of action under § 301.
 
 V.
 
 22
 After trial plaintiffs amended their complaint to allege that the union's interference with Iodice's customers not only violated § 303 of the LMRA but also constituted a tortious interference with contractual relations, in violation of New York's common law. 345 F.Supp. at 259. The district court granted leave to amend but then dismissed the cause of action on the merits. Id. at 274. We affirm the dismissal.
 
 
 23
 In Local 20, Teamsters, Chauffeurs & Helpers Union v. Morton, 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964), the Supreme Court held that "state law has been displaced by § 303 in private damage actions based on peaceful union secondary activities ...." 377 U.S. at 261, 84 S.Ct. at 1259. Since the district court in the present case found no evidence of violence, 345 F.Supp. at 264-65, the plaintiffs are entitled to neither compensatory nor punitive damages under state law.[10] See United Mine Workers v. Gibbs, 383 U.S. 715, 721, 729-30, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).[11]
 
 VI.
 
 24
 In their amended complaint, plaintiffs also alleged that Local 456 violated § 1 of the Sherman Act, 15 U.S.C. § 1 (1980), by conspiring with a non-labor group, the employers association, to restrain trade in the Westchester County construction industry. They claimed that the conspiracy encompassed the union's practices of requiring non-association employers to pay the same wages as the association was paying, fining employers for hiring non-union labor, and "featherbedding." The district court dismissed the antitrust cause of action 345 F.Supp. at 274, and we affirm.
 
 
 25
 Union activity of the type complained of here does not lose its exemption from the antitrust laws[12] unless it is part of a conspiracy or combination between a union and a non-labor group. See United Mine Workers v. Pennington, 381 U.S. 657, 661-62, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); United States v. Hutcheson, 312 U.S. 219, 232, 61 S.Ct. 463, 85 L.Ed. 788 (1941). The district court found that there was insufficient evidence of any such conspiracy between Local 456 and the employers association. 345 F.Supp. at 269. We therefore hold that Local 456 did not violate the antitrust laws.
 
 
 26
 The decision of the district court as to the cause of action under § 301 is reversed. The decision of the district court as to the cause of action under § 303 is affirmed but the case is remanded for a reassessment of damages in a manner consistent with this opinion. In all other respects, the decision of the district court is affirmed.
 
 
 
 [1]
 The plaintiffs originally claimed that the defendants had violated § 340 of the New York General Business Law (McKinney's Consol.Laws, c. 20, 1968) and the New York common law against secondary picketing and boycotting, and that Calabrese had violated the fiduciary duties which he owed to Local 456 under New York law. 345 F.Supp. at 248. The cause of action for violation of § 340 and for Calabrese's breach of fiduciary duty were withdrawn in plaintiffs' closing argument, and the cause of action for violation of New York's secondary boycott law was dismissed by the district judge on the ground that § 303 pre-empts state law in the area of secondary activities. 345 F.Supp. at 274. See Part V infra. No objections to this dismissal were on appeal. After trial the plaintiffs moved for leave to amend their complaint to add causes of action for tortious interference with contractual relations and for violation of the antitrust laws. The district court granted leave to amend, 345 F.Supp. at 258, but dismissed the causes of action on the merits. Id. at 274. See Parts V and VI infra
 
 
 [2]
 Some time after the conclusion of the trial in the district court, Peter Calabrese died. His wife, as executrix of his estate, has been substituted as a defendant. See 345 F.Supp. at 253 n. 1
 
 
 [3]
 Article VII of the contract, entitled Extra Equipment, provided:
 "In the event the Employer hires additional equipment from employers not under contract with the union, his employees shall operate such equipment if they are not otherwise assigned to work but, in any event, such hired equipment shall be operated by an employee in accordance with the provisions of this agreement."
 Article XIII of the contract, entitled Outside Contracts, provided:
 "The Employer shall not, during the term of this agreement, contract or agree to contract or otherwise assign, work performed by employees covered by this agreement to any other firm, contractor, corporation, partnership, individual or otherwise, except as provided by Article VIII hereof. It is agreed that employees covered by this agreement shall continue to do all types of work heretofore performed by them. The Employer shall use employees covered hereby to move cranes, cats or shovels. However, if an independent contractor is engaged for such work, he shall perform the same under conditions not less favorable than those contained herein."
 
 
 [4]
 § 8(b)(4)(B) of the Labor Management Relations Act, 29 U.S.C. § 158(b)(4) (B) (1970), provides the following:
 "(b) It shall be an unfair labor practice for a labor organization or its agents-
 "... (4)(ii) to threaten, coerce or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is-
 "... (B) forcing or requiring any person ... to cease doing business with any other person ...
 "Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise lawful, any primary strike or primary picketing ..."
 
 
 [5]
 § 303 of the Labor Management Relations Act, 29 U.S.C. § 187 (1970), provides the following:
 "(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) or this title.
 "(b) Whoever shall be injured in his business or property by reason or (sic) any violation of subsection (a) of this section may sue therefor ... and shall recover the damages by him sustained and the cost of the suit."
 
 
 [6]
 We are satisfied that the jurisdictional requirements of § 303 have been met. See 345 F.Supp. at 260 n. 8
 
 
 [7]
 For purposes of its opinion, the district court assumed without finding that the union acted in part to enforce the work preservation clause. 345 F.Supp. at 26- 61. However, plaintiffs contend, with support in the record, that the contractors who hired Iodice did not have the equipment necessary to move the type of heavy machinery which Iodice was hired to move. They argue, therefore, that the union was really totally unconcerned with preserving its jobs with the contractors since those jobs were in no way affected by the hiring of Iodice
 
 
 [8]
 Plaintiffs attempted to prove their damages by comparing the profit earned in 1969 by Pleasant Excavators and Equipment Rental Co., which they claim was almost identical to Thornwood in all relevant respects including ownership and management, with the average annual profits earned by Iodine, individually and with Thornwood, while the trouble with Local 456 was still a factor. See 345 F.Supp. at 271
 
 
 [9]
 The parties stipulated that plaintiffs may recover damages only for the period subsequent to February 11, 1963. 345 F.Supp. at 270
 
 
 [10]
 Punitive damages are also not available under § 303. See Local 20, Teamsters, Chauffeurs, & Helpers Union v. Morton, 377 U.S. at 260, 84 S.Ct. 1253
 11Plaintiffs cite Linn v. United Plant Guard Workers, Local 114, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966) and Abrams v. Carrier Corp., 434 F.2d 1234 (2d Cir. 1970) in support of their claim for damages under state law. We find these cases inapposite. In Linn the Court held that the interest of the state in protecting its residents from malicious libel is "an overriding state interest," comparable to its interest in the "maintenance of domestic peace," and that state law is therefore not preempted by the LMRA when such statements are made in the course of a union organizational campaign. 383 U.S. at 59-61, 86 S.Ct. 657. See Abrams v. Carrier Corp., supra, 434 F.2d at 1254. The Linn Court also distinguished previous preemption cases by pointing out that the LMRA is concerned only with the possible coercive effect of libelous statements in organizational campaigns, while a state libel action is the only means of vindicating the individual's reputation regardless of the effect, if any, on the labor dispute. Id. 383 U.S. at 63, 86 S.Ct. 657. In the instant case, however, there is no claim of malicious libel and the private damage action under § 303 protects essentially the same interests as the plaintiffs' proposed action under state law for tortious interference with contractual relations.
 
 
 [12]
 See §§ 6 and 20 of the Clayton Act, 15 U.S.C. § 17 and 29 U.S.C. § 52 (1970); §§ 4, 5 and 13 of the Norris-LaGuardia Act, 29 U.S.C. §§ 104-105, 113 (1970)